**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GUARANTY RESIDENTIAL LENDING, INC.,
a Nevada corporation and ASSURAFIRST
FINANCIAL COMPANY, a Michigan corporation
d/b/a HOMESTEAD USA and HOMESTEAD
MORTGAGE,

    Plaintiff, Counter-Defendant,                  CASE NO. 04-74842

v.                                                      PAUL D. BORMAN
                                                      UNITED STATES DISTRICT JUDGE

HOMESTEAD MORTGAGE COMPANY,
L.L.C., a Michigan corporation,
CENDANT MORTGAGE CORP. d/b/a
COLDWELL BANKER MORTGAGE,

    Defendant, Counter-Plaintiff,

BOB FITZNER d/b/a HOMESTEAD MORTGAGE
COMPANY, an individual,

    Counter-Plaintiff.
_____/

**OPINION AND ORDER DENYING COUNTER-PLAINTIFFS' MOTION FOR A**
**TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY**
**INJUNCTION**

    Now before the Court is Counter-Plaintiffs' Motion for a Temporary Restraining Order

pursuant to Federal Rule of Civil Procedure 65(b) and Motion for Preliminary Injunction

pursuant to Federal Rule of Civil Procedure 65(a). The motion hearing was held on November

16, 2005.

**I.    BACKGROUND**

Defendant/Counter-Plaintiff Homestead Mortgage L.L.C. ("Homestead LLC"), is a Michigan corporation with its principal place of business based in Macomb Township, Michigan. (Counter-Def.'s Countercl. ¶ 3). Counter-Plaintiff Bob Fitzner is an individual residing in Austin, Texas. (*Id*. at ¶ 4). Bob Fitzner incorporated Bob Fitzner, Inc. ("Fitzner, Inc.") in Texas on April 21, 1992. (Counter-Def.'s Resp. Ex. 4). Plaintiff /Counter-Defendant Guaranty Residential Lending Inc. ("Guaranty"), is a Nevada corporation with its principal place of business in Austin, Texas. (*Id*. at ¶ 5). Counter-Defendant AssuraFirst Financial Company ("AssuraFirst"), doing business as "Homestead USA" and "Homestead Mortgage," is a Michigan corporation with its principal place of business in Southfield, Michigan. (*Id*. at ¶ 6). Guaranty and AssuraFirst (collectively "Counter-Defendants") provide, offer, market and facilitate mortgage services for real estate transactions, as well as other financial and mortgage related transactions. (Counter-Pl.'s Compl. ¶ 10).

Homestead was formed by Darren Chase, who previously operated as a mortgage broker, maintained a business relationship with Guaranty, and who had prior knowledge of the marks at issue in this case. (Docket No. 19, Opinion and Order 3). On November 8, 1993, Fitzner, Inc. filed for the registration of the "Homestead Mortgage" mark with the United States Patent and Trademark Office. (*Id*.). Homestead and Bob Fitzner (collectively "Counter-Plaintiffs") claim that Fitzner, "Fitzner, Inc.," and/or any predecessor-in-interest have used the "Homestead Mortgage" mark since June of 1992. (Counter-Def.'s Resp. Ex 1). According to the Certificate of Registration for "Homestead Mortgage," Fitzner, Inc. alleged the mark was first used in August of 1991. (*Id*.).

Counter-Plaintiffs claim that Bob Fitzner is the owner of all right, title and interest in the

2

"Homestead Mortgage" mark (U.S. Trademark Registration No. 196129). (*Id*.). The trademark was filed on November 9, 1993 and was registered on the Principal Register on March 12, 1996. (*Id*.). Counter-Plaintiffs also claim that Counter-Defendants "actively and continuously" used one or more of the following marks in association with mortgage related services: "Homestead," "Homestead Mortgage," "Homestead USA," "Homestead Mortgage USA, Inc.," "Homestead Mortgage Company," and "Homestead Funding USA, Inc." (*Id*. at 9).

In May of 1998, a Michigan corporation operating under the name of Homestead Mortgage Company, as predecessor-in-interest to Counter-Defendants, applied for registration of the mark "Homestead Mortgage" for mortgage lending and brokerage services with the Patent and Trademark Office. (Counter-Pl.'s Br. 1). The application was denied by the Examining Attorney on the ground that the use of the mark would cause confusion with the "Homestead Mortgage" mark owned by Fitzner, Inc. (*Id*.).

On August 1, 2001, Fitzner, Inc. filed for bankruptcy in the Northern District of Texas. (Counter-Def. Resp. Ex. 7). Fitzner, Inc.'s Texas Corporation charter was forfeited on March 22, 2002 pursuant to Section 171.309 of the Texas Tax Code. (Counter-Def.'s Resp. Ex 3).

On December 12, 2004, Guaranty filed a Complaint against Homestead alleging the same claims as in its Amended Complaint. AssuraFirst was not a Plaintiff in the Original Complaint filed by Guaranty. Guaranty filed its own Motion for Temporary Restraining Order and Motion for Preliminary Injunction on December 24, 2004, seeking to prevent Homestead from using the "Homestead Mortgage" mark. The Court granted Guaranty's Motion for a Temporary Restraining Order on December 30, 2004. Homestead filed its Answer and Affirmative Defenses to Guaranty's Original Complaint on January 3, 2005. The Court granted Guaranty's

3

Motion for Preliminary Injunction on January 14, 2005.

On January 17, 2005, Homestead and Bob Fitzner entered into a license agreement. (Counter-Pl.'s Compl. ¶ 9). Through the license agreement, Homestead utilized the "Homestead Mortgage" mark in connection with mortgage brokerage services in Michigan, along with the right to bring suit for all past, current or future infringements of the mark. On June 21, 2005, Plaintiffs filed an Amended Complaint alleging Unfair Competition under the Lanham Act, Common Law Unfair Competition, Unjust Enrichment and Common Law Trademark Infringement. Counter-Plaintiffs filed its Answer and Counterclaim to Plaintiff's Amended Complaint alleging Infringement of a Federally Registered Trademark, False Designation of Origin and Unfair Competition and Violation of the Michigan Consumer Protection Act on July 5, 2005. Counter-Plaintiffs filed the instant motions on September 9, 2005.

Counter-Plaintiffs argue that subsequent to the Court granting Guaranty's Motion for Temporary Restraining Order and Motion for Injunctive Relief, Homestead has acquired incontestable rights to use the "Homestead Mortgage" mark in Michigan. (Counter-Pl. Br. 3). Additionally, Counter-Plaintiffs argue that Bob Fitzner also has superior rights to the mark. (*Id*.). Counter-Plaintiffs contend that they have a likelihood of success on the merits. (*Id*. at 5). In attempting to show a strong likelihood of success, Counter-Plaintiffs focus on the strength of their mark and Counter-Defendants intent in selecting the mark. (*Id*. at 6, 7). Further, Counter-Plaintiffs argue that they will suffer irreparable harm if Counter-Defendants continue to use the "Homestead USA" mark. (*Id*. at 9). Finally, Counter-Plaintiffs assert that Counter-Defendants' use of the "Homestead USA" mark has a negative impact on public interest and that the balancing of harms warrants the issuance of a temporary restraining order and preliminary

2:04-cv-74842-PDB-MKM   Doc # 76   Filed 12/13/05   Pg 5 of 17   Pg ID 1075


injunction. (*Id*. at 10, 11).

Counter-Defendants' contend that Counter-Plaintiffs do not have a likelihood of success on the merits. Counter-Defendants aver that Counter-Plaintiffs' asserted mark is invalid. (*Id*.). Counter-Defendants argue that the "Homestead Mortgage" registration recites a registrant of Fitzner, Inc., not Bob Fitzner. (Counter-Def. Resp. 1). Counter-Defendants also aver that the January 14, 2005 Preliminary Injunction has never been vacated. (*Id*. at 15). Further, Counter-Defendants assert that Counter-Plaintiff's cannot demonstrate irreparable harm. (*Id*. at 16). Counter-Defendants claim that Counter-Plaintiffs' delay between obtaining the license to the mark and asserting the instant motions, bar the issuance of either a temporary restraining order or a preliminary injunction. (*Id*. at 16). Counter-Defendants also claim that Counter-Plaintiffs' licensing agreement has a dollar value which demonstrates the existence of an adequate remedy at law. (*Id*. at 18).

## II.   ANALYSIS

### A.   Standard of Review

The Court must consider the following four factors in determining whether to issue a preliminary injunction: 1) whether the plaintiff has a strong likelihood of success on the merits; 2) whether the plaintiff will suffer irreparable harm absent the injunction; 3) whether the issuance of the preliminary injunction will cause substantial harm to others; and 4) whether the issuance of the injunction will further the public interest. *Midwest Guaranty Bank v. Guaranty Bank*, 270 F. Supp. 2d 900, 907 (E.D. Mich. 2003).

### B.   Discussion

### 1. Likelihood of Success on the Merits

Title 15 U.S.C. §§ 1114(1) and 1125(a), govern trademark infringement and unfair-competition claims.  Section 1125 prohibits the use of any term, name, symbol, etc. that is likely to cause confusion, mistake, or to deceive as to the affiliation or association of the user with the senior user.  15 U.S.C. § 1125(a).  Section 1114 protects a trademark owner from any unauthorized uses that are likely to cause confusion, cause mistake, or to deceive.  15 U.S.C. § 1114(1).  Thus, to prevail on an unfair-competition or trademark infringement claim under the Lanham Act, the plaintiff must demonstrate a likelihood of confusion.  *Frisch's Restaurants Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 647 (6th Cir. 1982).

In determining whether an alleged infringement constitutes a likelihood of confusion, the Sixth Circuit considers the following factors:

1) strength of plaintiff's mark;
2) relatedness of the goods;
3) similarity of the marks;
4) evidence of actual confusion;
5) marketing channels used;
6) degree of purchaser care;
7) defendant's intent in selecting the mark; and
8) likelihood of expansion in selecting the mark.

*Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1186 (6th Cir. 1988).  Based upon its analysis of these factors, as outlined below, the Court finds that Counter-Plaintiffs have not demonstrated a strong likelihood of confusion.

Counter-Plaintiffs argue that this Court has already decided many of the likelihood of confusion factors in the Court's Order Granting Plaintiff's Motion for Preliminary Injunction. (Docket No. 19, Opinion and Order 8).  Specifically, Counter-Plaintiffs state "that the relatedness of 'Homestead USA' and 'Homestead Mortgage,' the similarity of the two marks, the

evidence of actual confusion of the marks, the similar marketing channels used, and the degree of purchaser care all indicate that there is a strong likelihood of confusion of the marks."[1] (Counter-Pl. Br. 6). Counter-Plaintiffs presently contend that the strength of the mark is in their favor and that Counter-Defendants knew about the registration of "Homestead Mortgage" and intentionally infringed on the mark. (*Id*. at 6-7).

      Counter-Defendants believe that Counter-Plaintiffs do not have a likelihood of success on the merits. They argue that Counter-Plaintiffs mark is invalid. (Counter-Def. Resp. 5). Counter-Defendants support this contention by arguing that the service mark certificate states that the original registrant was Fitzner, Inc., not Bob Fitzner. (*Id*. at 6). Counter-Defendants argue that the "Notice of Incorporation of Business," which appeared in the Grapevine Sun newspaper in Texas, was not a written assignment of the mark, but used to comply with the filing requirements of a Texas Corporation, requiring publication of notice debts. (*Id*. at 8). Further, Counter-Defendants argue that even if the "Notice of Incorporation" was a written assignment, Fitzner, Inc. was not a legal entity as of the date of the publication and not capable of receiving or holding assets. (*Id*. at 9). Counter-Defendants aver that there is no written instrument evidencing the sale or transfer of the goodwill of the mark, as required by 15 U.S.C. § 1060. (*Id*. at 10). It is Counter-Defendants' contention that Bob Fitzner never relinquished the right to do business under the mark. (*Id*.). Counter-Defendants argue that Fitzner, Inc. was not the legal owner of the mark and the registration was void because Bob Fitzner never relinquished the right to use the mark. (*Id*. at 13). Additionally, Counter-Defendants argue that the January 14, 2005, Preliminary Injunction was not vacated. (*Id*. at 15).

---

[1] Counter-Defendants do not argue this point.

### a. Strength of the Mark

"The strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore the more protection it is due." *Frisch's Restaurants Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1264 (6th Cir. 1985). "Unless a registered mark is successfully challenged within five years of registration, § 14 of the Lanham Act, 15 U.S.C. § 1065, makes clear that the trademark becomes incontestable." *Wynn Oil Co, v. Thomas*, 839 F.2d 1183, 1186-87 (6th Cir. 1988).

Counter-Plaintiffs rely solely on the argument that their "Homestead Mortgage" mark is strong because it is incontestable. Counter-Plaintiffs' "Homestead Mortgage" mark was filed in 1993 and registered in 1996. It has been in continuous use by Counter-Plaintiffs since that date. "[N]o particular finding of likelihood of entry or irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases. *Circuit City Stores, Inc. v. Carmax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999). Since "Homestead Mortgage" was registered in 1996 and Plaintiffs/Counter-Defendants did not bring the original action until 2004, more than five years have lapsed, making the mark incontestable under *Wynn*.

However, Counter-Defendants argue that though Bob Fitzner claims that all rights in the mark were transferred to Fitzner, Inc., there is no written assignment between the parties of the alleged transfer and the goodwill associated with the mark was not assigned. Counter-Defendants cite *Liquid Glass Enterprises, Inc. v. Liquid Glass Industries of Canada, Ltd.*, Case No. 88-71510, 1989 WL 222653, *4 (E.D. Mich. Apr. 28, 1989) (Cohn, J) (unpublished), which states that under 15 U.S.C. § 1060:

> "[a] registered mark . . . shall be assignable with the goodwill of the business in which the mark is used , or with that part of the goodwill of the business

> connected with the use of and symbolized by the mark . . . . Assignments shall be by instruments in writing duly executed."

Counter-Plaintiffs respond that a formal written assignment of common law rights is not needed because those rights pass to the corporation when incorporated.

"[T]itle to a trademark pass[es] upon incorporation. . . . '[N]either a formal assignment nor recordation of an assignment in the Patent and Trademark Office is necessary to pass title or ownership to common law or statutory trademark rights.'" *Huang v. Tzu Wei Chen Food Co*, 849 F.2d 1458, 1460 (Fed. Cir. 1988) (citing *American Mfg. Co. v. Phase Indus. Ins*., 192 USPQ 498, 500 (TTAB 1976)). The Court finds that the common law rights Bob Fitzner had in the "Homestead Mortgage" mark were assigned to Fitzner, Inc. on April 21, 1992, at the time of incorporation.

Though a written assignment is not needed, there appear to be some questions regarding the validity of the mark's registration. "[A]n accused infringer may assert invalidity as a defense to an infringement suit. *Genderm Corp v. Ferndale Laboratories, Inc.*, 1994 WL 706591, *4 (E.D. Mich Jun. 9, 1994) (Duggan, J) (unpublished). There are some inconsistencies in Counter-Plaintiffs' brief in support and reply regarding the use of the mark that may show invalidity of the mark's registration. Homestead Mortgage Company is listed as an assumed name on the September 14, 1993, Travis County Assumed Name Records Certificate in Exhibit 10 of the Counter-Defendants' Response. According to Counter-Plaintiffs, the assignment of the mark transferred to Fitzner, Inc. at the time of incorporation, April 21, 1992. However, the assumed name of Homestead Mortgage Company is designated on the form as a corporation with Bob Fitzner listed as the owner, not Fitzner, Inc. (Counter-Defs.' Resp. Ex. 10). This inconsistency creates confusion and puts into question whether Bob Fitzner is using the mark for his individual

9

purposes, since he is listed as the owner on the form, or whether Fitzner, Inc. is registering the assumed name, since it is the alleged owner of the mark.

Additionally, the Application for Registration of Trademark or Service mark was used to register the "Homestead Mortgage" mark in Texas. (Counter-Defs.' Resp. Ex. 9). The completed application states that the mark has been used by the applicant both "anywhere" and "in Texas" since August 1, 1991. According to the form, the applicant is Bobbie Ray Fitzner of Austin, Texas, not Bob Fitzner, Inc. Assuming that what is stated on the application is true, then Fitzner, Inc. and Bob Fitzner were using the mark concurrently since the time of Fitzner, Inc.'s incorporation. The concurrent use of the mark by Bob Fitzner and Fitzner, Inc. also questions the validity of whether Fitzner, Inc. is the true owner of the registration, as the applicant of the mark must be the owner at the time of filing. *Huang*, 849 F.2d 1459. Bob Fitzner only added to the confusion when he stated that "[i]n 1992, with the dissolution of the company, and the *continued use of the mark for mortgage brokerage services by Bob Fitzner personally*, all rights in the mark were transferred to Bob Fitzner personally and ultimately documented by the 2005 assignment." (Counter-Def. Resp. Ex. 12) (emphasis added). Bob Fitzner seemingly admits that he had personally use of the mark since 1992 when the mark was transferred to him by Fitzner, Inc. Bob Fitzner's personal use of the mark and the dissolution of Fitzner, Inc. in the same year is a direct contradiction to Counter-Plaintiffs' claim that Fitzner, Inc. was the owner and user of the mark.[2]

---

[2] Additionally, Bob Fitzner filed for personal bankruptcy on August 1, 2001. Counter-Plaintiffs claim that at the time the bankruptcy estate was determined, Bob Fitzner did not personally own the mark. Counter-Plaintiffs claim that the stock in the corporation was abandoned by the Trustee in the process of the bankruptcy because it was valued at $0.00. At the motion hearing on this issue, Counter-Defendants argued that the mark was not disclosed to

The above inconsistencies prohibit the Court from accurately analyzing the strength of Counter-Plaintiffs' mark. Accordingly, the Court finds that the likelihood of success is weakened due to the above inconsistencies.

### b.     Counter-Defendants' Intent in Selecting the Mark

Where there is intentional infringement of a mark, a court is more likely to find a likelihood of confusion. *Wynn*, 943 F.2d at 602. Knowledge of another's prior use supports an inference of intentional infringement. *Id*. at 603.

Counter-Defendants knew that the "Homestead Mortgage" mark was already registered to someone else on November 2, 1998, when their trademark registration was rejected. Not only did Counter-Defendants have notice that "Homestead Mortgage" was registered through their trademark registration rejection, but the Trademark Trial and Appeal Board rejected Counter-Defendants registration after comparing their mark to "Homestead Mortgage." Counter-Plaintiffs claim that the fact that Counter-Defendants continued to spend money to promote and expand the mark, even though their registration was rejected, is further evidence of intent. Counter-Defendants did not respond to this issue. Accordingly, this factor weighs in favor of Counter-Plaintiffs.

### c.     January 14, 2005, Preliminary Injunction Order

Counter-Defendants argue that Counter-Plaintiffs are not likely to succeed on the merits for the claims of service mark infringement and unfair competition for the "Homestead

---

the Bankruptcy Trustee and further, if the mark has some monetary value, then it should be part of the bankruptcy estate. At this time, it is unclear whether the mark is part of the bankruptcy estate or whether Fitzner, Inc. could legally transfer the mark to Bob Fitzner after the bankruptcy case closed on January 29, 2002. Bob Fitzner reopened his bankruptcy case on January 10, 2003 and the case remains open.

Mortgage" mark, because of the Court's prior Order which granted a preliminary injunction to Counter-Defendants against Homestead. Counter-Plaintiffs contend that the order has not been vacated and already contains findings under Federal Rule of Civil Procedure 65 that Counter-Defendants were likely to succeed on the merits because of Counter-Defendants' prior use of the mark since 1988. Counter-Plaintiffs argue that Counter-Defendants' prior use is not relevant any longer because the "Homestead Mortgage" mark is an incontestable registration. Counter-Plaintiffs further argue that the preliminary injunction was issued against Homestead before Bob Fitzner became a party in the suit.

This Court's January 14, 2005 Opinion evaluated the likelihood of success between Guaranty and Homestead. The Court found "that Plaintiff has demonstrated a strong likelihood of success on the merits of its unfair competition claim under the Lanham Act; the existence of irreparable harm to itself and substantial harm to others absent the issuance of the injunction, and that the issuance of the injunction would further the public interest." (Docket No. 19, Order and Opinion 11). However, in the instant motion, additional parties are involved, and, Counter-Plaintiffs subsequently allegedly purchased a license to use the mark in Michigan, possibly gaining a superior right to its use. Counter-Plaintiffs have always been subject to the Federally Registered "Homestead Mortgage" mark. Though it is unclear whether Bob Fitzner owns the mark and thus whether Homestead owns a license to use the mark, the Court, at this time, finds that the January 14, 2005 Preliminary Injunction does not preclude the Court from finding a likelihood of success on the merits.

### 2.     **Irreparable Harm to Counter-Plaintiff**

A party seeking injunctive relief must show that it would suffer irreparable harm absent

such relief.  *Wynn*, 943 F.2d at 608.  Where a plaintiff demonstrates a strong likelihood of confusion, the court generally presumes that Plaintiff would suffer irreparable harm absent the issuance of the injunction.  4 *McCarthy on Trademarks and Unfair Competition* § 30.18(2).; *Epstein on Intellectual Property* § 7.03[C][1].

   Counter-Plaintiffs argue that Homestead is suffering irreparable injury because of the confusion created by the existence of Counter-Defendants' mark.  Counter-Plaintiffs also argue that Counter-Defendants are "reaping" the benefits of the time and money invested by Homestead in the "Homestead Mortgage" mark.   Counter-Defendants contend that Counter-Plaintiffs are not suffering irreparable harm because there was too long of a delay between when the parties began to coexist using the same mark and when the suit was filed.  Counter-Defendants also argue that they first used the "Homestead Mortgage" mark in Texas in 1999.  Counter-Plaintiffs did not file suit until July of 2005 and did not bring a Motion for Temporary Restraining Order or Preliminary Injunction until September of 2005.  Counter-Defendants claim that the nearly 6 years between the use of the "Homestead" mark in Texas and Counter-Plaintiffs' request for equitable relief shows there was no irreparable harm.

   "Plaintiff's delay in seeking a preliminary injunction undermines their allegation of irreparable harm."  *Wells Fargo v. WhenU.com, Inc*., 293 F. Supp. 2d 734, 772-72 (E.D. Mich. 2003) (referring to a delay of nine months before the plaintiff brought a motion for injunctive relief).  "Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Blockbuster v. Laylco, Inc*., 869 F. Supp. 505, 516 (E.D. Mich. 1994) (citing *Citibank, N.A. v.*

*Citytrust*, 756 F.2d 273, 275-76 (2nd Cir. 1985)); *Weight Watchers Int'l, Inc., v. Luigino's, Inc.*, 423 F.3d 137, 144 (2nd Cir. 2005) ("[A presumption of irreparable injury] may be defeated . . . when a party has delayed in seeking injunctive relief. 'The failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" (citations omitted)); *Oakland Tribune, Inc. v. The Chronicle Publishing Co., Inc.,* 762 F.2d 1376, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *High Tech v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) ("Absent a good explanation, not offered or found here, 17 months is a substantial period of delay that militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief."); *see also John Lemmon Films, Inc. v. Atlantic Releasing Corp.*, 617 F. Supp. 992, 996 (W.D. N.C. 1985) ("Perhaps even more telling of the absence of convincing proof that the Plaintiff would suffer irreparable harm is the Plaintiff's delay in seeking an injunction.").

     Assuming Counter-Plaintiffs' argument that Bob Fitzner is the owner of the mark, then he waited six years from the date Counter-Defendants first used the "Homestead USA" mark in Texas. Even if Bob Fitzner was not aware of the use, he did not move for an injunction until nearly nine months after Homestead licensed his mark. Additionally, Homestead and Bob Fitzner waited six months to file their counterclaim after obtaining a license to use the "Homestead Mortgage" mark in Michigan on January 17, 2005 and nine months to bring this motion for an injunction on September 9, 2005, even though it was aware of Counter-Defendants' alleged infringement of the mark.

14

In the Court's January 14, 2005 Order, the Court found that Guaranty suffered the irreparable harm, not Homestead. Homestead's single action of subsequently purchasing the license from Bob Fitzner does not suddenly create irreparable harm to Homestead and warrant a temporary restraining order or preliminary injunction. Accordingly, the Court finds that this weighs against a showing of irreparable harm to Counter-Plaintiffs.

Counter-Defendant's also argue that the willingness of Bob Fitzner to grant a license suggests that he has no compelling need for interim equitable relief. Counter-Defendant cites *High Tech v. New Image Indus., Inc.*, 49 F.3d 1551(Fed. Cir. 1995), to support this proposition. In *High Tech*, the court involved patent infringement where district court granted the patent holder's motion for preliminary injunction. 49 F.3d at 1552. Dealing with the issue of irreparable harm on appeal, the court found the patent holder offered a license to the defendant, showing a willingness to forgo its patent rights for compensation. *Id*. at 1557. The court held that the evidence that the plaintiff offered to sell a license to the defendant "suggests that any injury suffered by [the plaintiff] would be compensable in damages assessed as part of the final judgment in the case." *Id*. In the instant case, Counter-Plaintiffs have not divulged the amount paid to obtain a license on the mark. However, like in *High Tech*, a transaction for a license of the mark did occur, (*see* Counter-Def. Resp. Ex. 2), suggesting that both Counter-Plaintiffs were willing to forgo their rights for compensation. Accordingly, the Court finds that this factor weighs against the Counter-Plaintiffs.

### 3.    **Impact on Public Interest**

"Trademark infringement, by its very nature, adversely effects the public interest in the 'free flow' of truthful commercial information." *Gougeon Bros., Inc. v. Hendricks,* 708 F. Supp.

811, 818 (E.D. Mich. 1988). Counter-Plaintiffs claim that Counter-Defendants' use of the "Homestead Mortgage" and "Homestead USA" mark serves to deceive the public and therefore has a significant impact on the public interest. It is in the public interest to prevent consumer confusion. However, because the true owner of the mark at this time remains unclear, this factor does not weigh in favor of either party.

### 4. Balancing of Harm

The potential harm to Counter-Defendants if enjoined from using their names is not outweighed by the irreparable harm suffered by Counter-Plaintiffs if the Court does not issue an injunction. The harm to Counter-Plaintiffs is not irreparable, especially considering the delay in filing these motions. Additionally, Counter-Defendants have been using and relying on the mark in Michigan since 1988 and Texas since 1999, and the issuance of a preliminary injunction would significantly harm Counter-Defendants' businesses if they could no longer used the marks they have conducted business with since that time.[3] Accordingly, this factor weighs in favor of Counter-Defendants.

## III. CONCLUSION

After weighing the four temporary restraining order and preliminary injunction factors, the Court finds that the potential harm to Counter-Plaintiffs is outweighed by the potential harm to others. The Court is not convinced that there is a strong likelihood of success. Accordingly, the Court DENIES Counter-Plaintiffs' Motion for Temporary Restraining Order and Motion for Preliminary Injuntion.

---

[3] This is especially relevant considering the confusion and inconsistency with Counter-Plaintiffs' argument in favor of a strong likelihood of confusion.

**SO ORDERED.**

                                         s/Paul D. Borman
                                         PAUL D. BORMAN
                                         UNITED STATES DISTRICT JUDGE

Dated:  December 13, 2005

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on December 13, 2005.

                                         s/Jonie Parker
                                         Case Manager