UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FEDERAL DEPOSIT INSURANCE CORPORATION,
as Receiver for GUARANTY RESIDENTIAL LENDING,
INC., a Nevada Corporation, and
ASSURAFIRST FINANCIAL COMPANY,
a Michigan Corporation d/b/a HOMESTEAD
USA and HOMESTEAD MORTGAGE

       Plaintiffs, Counter-Defendants,
       Cross-Plaintiffs

                                   Case No. 04-74842

-vs-

                                   Paul D. Borman

HOMESTEAD MORTGAGE COMPANY,             United States District Judge
L.L.C., a Michigan Corporation

       Defendant, Counter-Plaintiff, and

BOB FITZNER d/b/a HOMESTEAD
MORTGAGE CO., an Individual

       Counter-Plaintiff, Cross-Defendant.
_____/

OPINION AND ORDER
(1) DENYING PLAINTIFFS/COUNTER-DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (DKT. NO. 184);
(2) GRANTING IN PART AND DENYING IN PART PLAINTIFFS/COUNTER-
DEFENDANTS' MOTION TO DISMISS (DKT. NO. 186);
(3) GRANTING IN PART AND DENYING IN PART PLAINTIFFS/COUNTER-
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 187); AND
(4) DENYING DEFENDANTS/COUNTER-PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND INJUNCTIVE RELIEF (DKT. NO. 182)

This matter is before the Court on:

(1) Plaintiffs/Counter-Defendants' Motion for Summary Judgment to Dismiss Counterclaims for

Failure to Assert an Enforceable and Protectable Interest in the Homestead Mark (Dkt. No. 184);

1

(2) Plaintiffs/Counter-Defendants' Motion to Dismiss the July 5, 2005 Counterclaim for Lack of Article III Standing and Lack of Subject Matter Jurisdiction or Alternatively for Summary Judgment on the Grounds of Mootness (Dkt. No. 186);

(3) Plaintiffs/Counter-Defendants' Motion for Partial Summary Judgment of Monetary Relief or Recovery Flowing From the July 5, 2005 Counterclaims (Dkt. No. 187); and

(4) Defendant/Counter-Plaintiffs' Motion for Partial Summary Judgment and Injunctive Relief on its Counterclaims (Dkt. No. 182).

All parties have filed responses and replies, along with supplemental briefing, and the Court held a hearing on November 4, 2010.   For the reasons that follow, the Court DENIES Plaintiffs/Counter-Defendants' Motion for Summary Judgment (Dkt. No. 184), GRANTS IN PART AND DENIES IN PART Plaintiffs/Counter-Defendants' Motion to Dismiss (Dkt. No. 186), GRANTS IN PART AND DENIES IN PART Plaintiffs/Counter-Defendants' Motion for Partial Summary Judgment (Dkt. No. 187), and DENIES Defendants/Counter-Plaintiffs' Motion for Summary Judgment and Injunctive Relief (Dkt. No. 182).

## I.    BACKGROUND

### A.    Procedural Background

On December 12, 2004, Guaranty Residential Lending, Inc. ("GRL"), doing business as Homestead USA, Inc. ("Homestead"), filed this action against Homestead Mortgage Company, LLC ("Homestead Mortgage") for Unfair Competition and Common Law Trademark Infringement, alleging that Homestead Mortgage intentionally misappropriated Homestead's common-law trademarks. (Dkt. No. 1.)   Homestead was in the business of "offering, marketing, facilitation and provision of mortgage services for real estate transactions, as well as other mortgage-related services

2

and other financial transactions, to the public under the famous and distinctive mark, HOMESTEAD USA." (Compl. ¶ 1.)  The Complaint alleges that Defendant Homestead Mortgage, a Michigan company, offered and provided similar, if not identical, mortgage-related services under the designation "HOMESTEAD MORTGAGE." (Compl. ¶ 2.)  The Complaint alleges that Darin Chase, who operated Homestead Mortgage and was its resident agent, previously had a business relationship with Plaintiff Homestead and had actual and prior knowledge of Homestead's use of the HOMESTEAD mark prior to the formation of Homestead Mortgage in 2004. (Compl. ¶ 3.)  The Complaint further alleges that Homestead Mortgage operated and offered these same mortgage-related services under the Homestead designation in multiple locations in the State of Michigan, one of which was within five (5) miles of Defendant's Homestead location. (Compl. ¶ 5.)

Plaintiff alleges that Homestead had extensively advertised and caused to be advertised throughout the United States numerous trademarks and service marks including the word marks, HOMESTEAD USA, HOMESTEAD MORTGAGE, as well as logo versions of the same. ("The Homestead Marks").  Plaintiff alleges that Homestead was the first to adopt and use the Homestead Marks and is the owner of those trademarks and service marks.  Plaintiff claims that use of the Homestead Marks is distinctive and Homestead has built and owns valuable goodwill in the Homestead Marks. (Compl. ¶¶ 6-7.)  Plaintiff alleges that sometime after 2004, after Homestead's use of and acquisition of distinctive rights in the Homestead Marks, Defendant Homestead Mortgage, without authority from Homestead, began to offer and market mortgage related services to the public using the designation HOMESTEAD MORTGAGE which copies or imitates the prior and existing Homestead Marks and infringes on Homestead's exclusive rights in the Homestead Marks within the meaning of the Lanham Act. (Compl. ¶ 8.)

3

On December 28, 2004, Plaintiff filed a motion for temporary restraining order and preliminary injunction, enjoining Defendant Homestead Mortgage from offering, marketing, facilitating or providing mortgage services for real estate and other financial transactions under the designation "Homestead Mortgage" which is confusingly similar to Homestead's marks "HOMESTEAD MORTGAGE" and "HOMESTEAD USA." (Dkt. Nos. 4, 5.) On December 30, 2004, this Court granted Plaintiff's motion for a temporary restraining order (Dkt. No. 12) and on January 3, 2005, issued an opinion explaining that, based upon the affidavits filed in support of the motion for a temporary restraining order, Plaintiff had demonstrated a strong likelihood of confusion of the competing marks given: (1) the strength of the mark - Plaintiff had promoted its Homestead Marks nationwide for over 15 years and had spent $4,000,000 doing so and that the founder of Defendant Homestead Mortgage was fully aware of Plaintiff's business and use of the marks prior to his use of the Homestead designation as Homestead Mortgage; (2) the relatedness and similarity of the marks; (3) the strong likelihood of actual confusion; (4) the similarity of the marketing channels employed by the two competitors; (5) unlikelihood that purchasers would exercise a high degree of care in distinguishing between the two; and (6) Defendant's blatant copying of the mark with knowledge of Plaintiff's prior use. (Dkt. No. 14.)

On May 13, 2005 Defendant Homestead Mortgage filed a motion for leave to file a counterclaim, based upon the fact that on January 17, 2005, Homestead Mortgage had obtained a license to use the federally registered trademark Homestead Mortgage from Bob Fitzner, the owner of that mark, and that the federally registered mark was superior to Plaintiff's mark and in fact, therefore, Plaintiff was infringing Defendant's superior mark. Defendant sought to add Fitzner as an additional counter-plaintiff. (Dkt. No. 21.) Homestead Mortgage later withdrew this motion when

4

Plaintiff filed, on June 22, 2005, an Amended Complaint enabling Defendant to add Fitzner as a party and to assert its counterclaims. (Dkt. Nos. 34, 36.) The Amended Complaint joined as a Plaintiff AssuraFirst Financial Company ("AssuraFirst"), which had recently purchased GRL's mortgage business.[1]  On July 5, 2005, Defendant Homestead Mortgage and Fitzner ("Defendants/Counter-Plaintiffs") filed their motion for a temporary restraining order and preliminary injunction, seeking to enjoin Plaintiffs GRL and Assurafirst d/b/a Homestead USA and Homestead Mortgage ("Plaintiffs/Counter-Defendants") from continuing to use the Defendants/Counter-Plaintiffs' Homestead Mortgage federally registered mark. (Dkt. No. 39.)

The Court denied Defendants/Counter-Plaintiffs motion for a temporary restraining order (Dkt. No. 76) and ultimately, on October 24, 2006, denied Plaintiffs/Counter-Defendants' motion to dismiss Defendants/Counter-Plaintiffs' counterclaim but held that Defendants/Counter-Plaintiffs lacked capacity to bring or defend a suit regarding the federally-registered Homestead Mortgage Mark. *Guar. Residential Lending, Inc. v. Homestead Mortgage Co., LLC*, 463 F. Supp. 2d 651, 661-662 (E.D. Mich. 2006) ("*GRL I*"). Subsequently, on May 16, 2007, Plaintiffs/Counter-Defendants stipulated to dismissal without prejudice of the claims set forth in the First Amended Complaint. (Dkt. No. 147.) On June 14, 2007, Defendants/Counter-Plaintiffs Fitzner and Homestead Mortgage filed their notice of appeal to the United States Court of Appeals for the Sixth Circuit. (Dkt. No. 148.)

On September 8, 2008 the Sixth Circuit issued an opinion and order reversing this Court and

---

[1]  On May 19, 2010, Magistrate Judge Majzoub issued an Order denying Defendants/Counter-Plaintiffs' motion to name Dennis Carr, Warren Carr and Bruce Carr, individual shareholders-directors of AssuraFirst, as Counter-Defendants in this action. (Dkt. No. 273.) This Order was never appealed.

holding that Fitzner and Homestead Mortgage had capacity to sue on the Mark.   *Guaranty Residential Lending, Inc. v. Homestead Mortgage Co., LLC and Bob Fitzner*, 291 F. App'x 734 (6th Cir. 2008) ("*GRL II*"). The Sixth Circuit first noted that Bob Fitzner had incorporated Bob Fitzner, Inc. ("BFI") in 1992 as a Texas Corporation and that, in 1993 BFI had filed the mark "Homestead Mortgage" with the U.S. Patent and Trademark Office ("PTO"). *Id*. at 735. The PTO registered the mark as a trademark in 1996. *Id*. The Sixth Circuit held that when the Texas Secretary of State forfeited BFI's corporate charter on March 22, 2002 for failure to pay its franchise fee, legal and equitable title to the assets of BFI (which included the federally registered Homestead Mark), which had been split by the dissolution of corporate privileges on March 20, 2001, the former then remaining with BFI and the latter passing to Fitzner as shareholder, "somewhat paradoxically" were rejoined in BFI by operation of Texas law which caused an involuntary dissolution of BFI upon forfeiture of its charter and gave back to BFI full title, including the right to sue or defend in Texas courts and other courts, for a period of three years, for purposes of winding down the dissolved corporation's affairs.   291 F. App'x at 736, 740.   Thus, the Sixth Circuit concluded, Fitzner's personal bankruptcy did not affect this legal revesting of title to the Mark in BFI and BFI therefore was able to pass full title to the Mark to Fitzner on January 17, 2005, before the three-year wind-down period expired.   Thus, Fitzner personally acquired full title at that time and could license the Mark, including the right to sue or defend on the Mark, which it did to Homestead Mortgage on January 26, 2005, for $10,000. *Id*. at 742.   Concluding that both Fitzner and Homestead Mortgage had capacity to sue on the Mark, the Sixth Circuit remanded to this Court for further proceedings consistent with that holding. *Id*. at 744.

In February, 2009 the parties filed the instant motions to dismiss and/or for summary

6

judgment. During the briefing on the instant motions, it became known that Fitzner had licensed other individuals to use the HOMESTEAD mark and on June 18, 2009, the Court ordered that Plaintiffs/Counter-Defendants be given two months to depose these previously undisclosed licensees and to re-depose Fitzner on the limited issue of the two alleged licensees. The Court also ordered Fitzner, who failed to disclose the existence of the two licensees during discovery, to pay the reasonable costs and attorneys' fees incurred by Plaintiffs/Counter-Defendants in connection with taking the depositions. (Dkt. No. 224.) Shortly thereafter, GRL failed and the Federal Deposit Insurance Corporation ("FDIC") was appointed receiver. As a result of the receivership, on the stipulation of the parties, on September 29, 2009, this Court entered a ninety-day stay of proceedings pursuant to the provisions of the Financial Institutions Reform and Recovery Enforcement Act of 1989, 12 U.S.C. §§ 1812 *et. seq.*, ("FIRREA"). (Dkt. No. 234). On December 21, 2009, this Court substituted the FDIC as the real party in interest for GRL (Dkt. No. 240) and on December 28, 2009, on the motion of the FDIC, the Court granted a further 180-day stay of proceedings pursuant to the provisions of FIRREA, permitting the parties to pursue and properly exhaust administrative remedies on any claims against the FDIC as receiver for GRL. (Dkt. No. 241.)

On expiration of the 180-day stay, the Court permitted the parties to file supplemental briefs in support of the instant motions, only to the extent necessary to incorporate and discuss issues relating to the two additional Fitzner licensees whose depositions the Court authorized on June 18, 2009. The motions are now fully briefed and ready for disposition.

**B.     Factual Background**

**1.     Plaintiffs/Counter-Defendants' claimed use of the mark.**

Plaintiffs/Counter-Defendants claim that Homestead was incorporated on March 31, 1987

in the State of Michigan to provide wholesale and retail mortgage brokerage services. (Dkt. No. 185, Declaration of Bruce Carr, February 23, 2009 ¶ 2.)[2]   Homestead began using the marks HOMESTEAD MORTGAGE and HOMESTEAD USA and similar variations of those marks on or about the date of incorporation and used the Homestead Marks continuously in connection with its mortgage brokerage services until it transferred all right, title, and interest in the marks to GRL as part of GRL's June 26, 2001 acquisition of the assets of Homestead. (Carr Decl. ¶ 2-3.)  GRL continued to use the marks until approximately December 2004, when the assets of GRL were sold to AssuraFirst.  By a trademark assignment dated December 31, 2004, GRL assigned all right, title and interest in the marks to AssuraFirst and ceased use of the marks. (Carr Decl.¶ 4.)  Subsequent to December 31, 2004, and to the present, AssuraFirst has ceased use of the marks.  (*Id.*)

Homestead began recording loans in 1988 in various Michigan counties and by 1996 had recorded loans in sixty-eight (68) or Michigan's eighty-three (83) counties and had recorded 1,791 mortgages in the State of Indiana and 187 in the State of Florida.  (Carr Decl. ¶ 5.)  By 1996, Homestead had also closed loans in the states of Arizona, Colorado, Florida, Illinois, Indiana, Kentucky, Missouri, North Carolina, Ohio, Tennessee, Virginia and Wisconsin. (Carr Decl. ¶ 6.) Most of the loans recorded in other states were administered by Homestead's Michigan office. (Carr Decl. ¶¶ 6-7.)

In December, 1999, Homestead registered to do business in the State of Texas under the name National Homestead USA, Inc. and began doing business under this assumed name in January, 2000.  Between December 1999 and June 2001 Homestead closed 160 loans in Texas and advertised

---

[2] Bruce Carr serves as the Chief Financial Officer of the AssuraFirst and also held the position of Chief Financial Officer of Homestead Mortgage.

8

in the yellow pages and on billboards in certain Texas counties from 2002-2004. (Carr Decl. ¶ 8.) The majority of Homestead's advertising, however, was done in the State of Michigan where, between 1989 and 1995, the company spent in excess of $412,000 on marketing the Homestead Marks. (Carr Decl. ¶ 10.) In 1998, Homestead attempted to apply for federal registration of its Homestead Mark but the application was denied. Homestead claims that it was not informed of the reason for the denial and claims that it was not aware, until the filing of this lawsuit, that any entity had previously used the Homestead mark for mortgage services. (Carr Decl. ¶ 11).

## 2.   Defendant Homestead Mortgage's use of the mark.

Homestead Mortgage, the original Defendant in this action, was formed by Darin Chase, who previously operated as a mortgage broker in Michigan and maintained a business relationship with Plaintiff Homestead and had prior knowledge of the marks at issue in this case. (Dkt. No. 19, Opinion and Order Granting Plaintiff's Motion for Preliminary Injunction, 3.) Chase formed Homestead Mortgage LLC on April 8, 2004 and began use of the Homestead Mortgage designation. (Dkt. No. 8, Declaration of Don Maiolatesi ¶ 4.) Defendant Homestead Mortgage does not deny its prior knowledge of the Homestead USA mark, but states that Plaintiff Homestead "was intending to cease operations in Michigan and/or change its name effective January 1, 2005," and was intending to operate under the name AssuraFirst Financial." (Dkt. No. 18, Def.'s Mot. for Reconsideration 6.) Chase states that although he was aware that Plaintiff Homestead had operated an office in Macomb County, Michigan, in proximity to his Homestead Mortgage location, he believed that the Homestead operation had closed and relied on advice of counsel in adopting and

9

using the Homestead Mortgage mark.[3]   (*Id.* at 9.)  Chase continued operation even after receipt of

a Cease and Desist letter from Plaintiff Homestead /GRL on September 30, 2004. (Dkt. No. 7, Carr

Decl., Dec. 23, 2004, ¶ 8, Ex. A.)

In continuing to use the Homestead mark in connection with its mortgage related services,

Homestead Mortgage purported to rely on the existence of a federally registered trademark, Reg. No.

1961295 belonging to third party Bob Fitzner, Inc. of Grapevine, Texas.  (Dkt. No. 18, Def.'s Mot.

for Reconsideration, 10.)   In moving this Court to reconsider its December 30, 2004 grant of

preliminary injunctive relief to Plaintiff Homestead/GRL, Defendant Homestead Mortgage argued

that Plaintiff Homestead was aware of this federally-protected mark by virtue of the PTO's rejection,

in 1998, of Homestead's application for a federal registration of its mark.  (*Id.* at 10.)  Subsequently,

on January 17, 2005, Homestead Mortgage LLC obtained "the exclusive rights to the trademark

Registration No. 1961295" from then third-party Bob Fitzner.  (Dkt. No. 21, Motion for Leave to

File Counterclaim, Ex. B, Darin Chase Affidavit, May 12, 2005 ¶ 2.)  According to the Certificate

of Registration for Mark No. 1961295, the alleged date of first use of the mark was August, 1991.

(Dkt. No. 184, Pls./Counter-Defs.' Mot. for Summ. Judg. on Counterclaim, Ex. A.)  On July 5, 2005,

Defendant Homestead Mortgage filed its Counterclaim based on the federally registered mark,

adding Bob Fitzner as a Counter-Plaintiff.  (Dkt. No. 36.)

---

[3] This Court previously concluded, based upon testimony that was given at the hearing on Plaintiff's
motion for a preliminary injunction held by phone on December 29, 2004, that "a mere change in
ownership of Plaintiff's parent company does not establish that Plaintiff disavowed use of the
Homestead marks." (Dkt. No. 19, Opinion and Order Granting Plaintiff's Motion for Preliminary
Injunction, p. 7.)  The Court found that although AssuraFirst was to be started as a new company,
it intended to continue to rely on the benefit from the Homestead marks in that business. (*Id.* at 8.)
The Court further found Chase's "alleged ignorance of any existing use of the marks dubious . . .
[and] likely in bad faith so as to partake of the goodwill and market strength of the Homestead
marks." (*Id.* at 9.)

### 3.   Use of the mark by Fitzner and BFI and Fitzner's licensees.

Fitzner claims to have first used the Homestead mark in August 1991. Fitzner claims to have transferred his right, title and interest in the Homestead mark to BFI in 1992 when BFI was incorporated. BFI filed for federal registration of the Homestead mark on November 8, 1993. The mark was registered on March 12, 1996. Fitzner and/or BFI continued to use the mark, closing loans in Texas only, until August 1, 2002 when Fitzner filed for personal bankruptcy. On January 17, 2005, BFI executed a trademark assignment in favor of Bob Fitzner with an effective date of March 8, 2002. (Dkt. No. 199, Defs./Counter-Pls.' Resp. to Mot. to Dismiss, Ex. E.) On January 26, 2005 Fitzner licensed the mark to Defendant Homestead Mortgage Company, LLC, whose president, Darin Chase, had previous business dealings with Plaintiffs/Counter-Defendants prior to receiving his license from Fitzner. Chase was fully aware of Plaintiffs/Counter-Defendants' prior use of the Homestead Mark. (*Id.* Ex. I; Dkt. No. 19, Jan. 14, 2005 Opinion and Order, p. 9.) On January 1, 2006 Fitzner licensed the mark to David Faul of Gladys, Texas. (*Id.* Ex. J.) Faul agreed to pay an annual royalty of $1,200. On April 25, 2006, Fitzner licensed the mark to Homestead Mortgage, Inc. in Washington State. (*Id.* Ex. L, Declaration of Robert Fitzner, March 25, 2009, ¶ 4.)

## II.   STANDARD OF REVIEW

### A.   Federal Rule of Civil Procedure 56

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the

11

nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

12

The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

**B.    Federal Rule of Civil Procedure 12(b)(1)**

Pursuant to Rule 12(b)(1), dismissal of an action is appropriate where a court does not enjoy subject matter jurisdiction. "A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence." *Abbott v. Michigan*, 474 F.3d 324, 328 (6th Cir. 2007) (citation omitted). Having invoked the jurisdiction of the federal courts, "the plaintiff bears the burden of proving that jurisdiction exists." *Id.* Thus, when evaluating a motion to dismiss pursuant to Rule 12(b)(1), the United States Court of Appeals for the Sixth Circuit has instructed:

> In reviewing a 12(b)(1) motion, the court may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction, and both parties are free to supplement the record by affidavits. However, where a defendant argues that the plaintiff has not alleged sufficient facts in her complaint to create subject matter jurisdiction, the trial court takes the allegations in the complaint as true.

*Nichols v. Muskingum College*, 318 F.3d 674, 677 (6th Cir. 2003) (internal citations omitted).

**III.    ANALYSIS**

As discussed above, Plaintiffs/Counter-Defendants no longer use the Homestead marks and stipulated to dismissal of their claims against Defendants Homestead Mortgage and Fitzner following this Court's opinion and order holding that Fitzner and Homestead Mortgage lacked capacity to sue on the federally-registered Homestead mark. (Dkt. No. 147, Stipulation and Order

13

of Dismissal.) Following the Sixth Circuit's reversal of that conclusion, the case returned to this Court and Plaintiffs/Counter-Defendants, who have ceased use of the Homestead mark and do not seek to reassert their original claims, now move to dismiss Defendants/Counter-Plaintiffs' Counterclaims, which assert that Plaintiffs/Counter-Defendants have and continue to infringe Defendants/Counter-Plaintiffs' superior rights in the federally-registered Homestead mark. Defendants/Counter-Plaintiffs also move the Court for judgment in their favor on their Counterclaims.

### A.     Plaintiffs/Counter-Defendants' Motions

While Plaintiffs/Counter-Defendants have filed three separate motions to dismiss and/or for summary judgment on Defendants/Counter-Plaintiffs' Counterclaim, in fact Plaintiffs/Counter-Defendants have not-so-cleverly circumvented the Court's page limitation on dispositive motions by making separate *arguments* for dismissal and presenting them in separate motions. Nonetheless, the Court will examine each argument in turn.

**1.     Defendants/Counter Plaintiffs have failed to assert an enforceable and protectable interest in U.S. service mark registration number 1,961,295 and the Court should cancel the 1993 registration of the mark or dismiss the counterclaims because Fitzner has abandoned any rights he may have had in the mark. (Dkt. No. 184 plus Supplemental Briefs, Dkt. Nos. 280, 274 and 285).**

**a.     Cancellation of the registration as a "naked assignment" or void *ab initio*.**

Plaintiffs/Counter-Defendants argue, as they have to this Court on numerous prior occasions, that this Court should cancel the March 12, 1996 registration of the Homestead Mortgage mark, Reg. No. 1,961,295 ("the '295 registration") because BFI did not own the mark on November 8, 1993 when it filed the '295 registration, which claimed a first use date of August, 1991. To summarize, Plaintiffs/Counter-Defendants argue that BFI, which was incorporated on April 21, 1992, could not

14

possibly claim a first use dating back to August, 1991, and that Bob Fitzner, the individual, never effectively transferred his right, title and interest in the mark to BFI.  Therefore, Plaintiffs/Counter-Defendants argue, the '295 registration was not filed in the name of the true owner of the mark and is void *ab initio*, relying on the well accepted legal proposition that an applicant must be the owner of the mark for which registration is requested, *see, e.g., Great Seats, Ltd. v. Great Seats, Inc.*, 84 U.S.P.Q.2d 1235, 2007 WL 1740870 at * 5 (T.T.A.B. June 14, 2007) (holding that in a use-based application for trademark registration, only the owner of the mark may file the application for registration of the mark, "if the entity filing the application is not the owner of the mark as of the filing date, the application is void ab initio.")  *See also Huang v. Tzu Wei Chen Food Co. Ltd.*, 849 F.2d 1458, 1460 (Fed. Cir. 1988).  Plaintiffs/Counter-Defendants reject the argument that Fitzner's personal ownership rights were automatically transferred to BFI when BFI was incorporated, and further contend that any attempted transfer by Fitzner to BFI was an invalid "assignment in gross" because Fitzner, the individual, continued to use and claim ownership of the mark after April 21, 1992.

Whatever merit this argument may have had, this Court impliedly rejected such an argument when it recognized that BFI held both legal and equitable title to the mark prior to the forfeiture of BFI's corporate privileges.   This Court held that when BFI assigned its HOMESTEAD MORTGAGE trademark on January 17, 2005 to Fitzner, personally, "BFI only had legal title in the mark, as beneficial title was in the bankruptcy estate." *Guaranty I*, 463 F. Supp. 2d at 662.  While the Sixth Circuit ultimately disagreed with the conclusion that BFI did not also retain (or rather regain through operation of Texas law) beneficial title, the Sixth Circuit also affirmed that BFI possessed, and transferred, full title to the Mark to Fitzner: "Once BFI dissolved, the company held

15

full title to the Mark. . . . BFI transferred all of its rights to the Mark to Fitzner in January 2005,

before the three-year wind-down period expired. Thus, Fitzner personally acquired full title to the

Mark at that time." *Guaranty II*, 291 F. App'x at 742.

Thus, Plaintiffs/Counter-Defendants are precluded, by the doctrine of law of the case, from

attempting to resurrect this argument which flies directly in the face of the holdings of both this

Court and the Sixth Circuit.[4] The law of the case doctrine "states that when a court decides upon a

rule of law, that decision should continue to govern the same issues in subsequent stages in the same

case." *Patterson v. Haskins*, 470 F.3d 645, 660-61 (6th Cir. 2006) (citation omitted). The doctrine

was developed to keep rulings consistent and avoid repetitious reconsideration of matters that have

already been decided course of a continuing lawsuit. *Rosales-Garcia v. Holland*, 322 F.3d 386, 398

n.11 (6th Cir. 2003). Since Counter-Plaintiffs responsive arguments only reiterate arguments and

facts presented to the Court in prior pleadings, the Court's orders operate as law of the case.[5] The

---

[4] Indeed, had the Sixth Circuit recognized the validity of this argument, which appeared in several pleadings filed in this Court, it would have been obliged, based on its own analysis, to conclude that Fitzner and Homestead Mortgage lacked capacity to sue. If, as Defendants/Counter-Plaintiffs argue, title to the mark never passed to BFI but was retained by Fitzner individually then, according to the Sixth Circuit's reasoning, Fitzner's equitable interest in the mark would have existed at the time he commenced bankruptcy and his failure to schedule that interest would render the mark property of the estate, with the result that neither Fitzner nor Homestead Mortgage would have capacity to sue on the mark: "The pivotal issue on appeal is this: when the trustee abandoned the estate back to Fitzner, did Fitzner still have an equitable interest in the Mark that existed at the time he commenced his bankruptcy case? If so, then his failure to schedule that interest would mean that it was not abandoned and the interest would be classified as property of the estate. Without full ownership of the Mark when he licensed it to HMC, neither Fitzner nor HMC would have the capacity to sue on the Mark." *Guaranty II*, 291 F. App'x at 738. The Sixth Circuit presumably never considered this a valid argument.

[5] Were the Court disposed to consider this argument, it would be inclined to conclude that the assignment of rights to BFI was adequate to transfer title to the mark. An assignment in writing is not necessary to pass common law rights to a trademark and such an assignment may be proven by strong evidence that such an assignment was intended. McCarthy, MCCARTHY ON TRADEMARKS

Court declines to cancel the registration as a naked assignment or void *ab initio*.

> **b.      Abandonment of rights to the '295 registration through uncontrolled naked licensing.**

The Lanham Act defines "abandonment" as follows:

A mark shall be deemed to be "abandoned" if either of the following occurs:

(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in the mark.

(2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

15 U.S.C. § 1127.   "To determine that a trademark or trade name is abandoned, two elements must

be satisfied: non-use of the name by the legal owner and no intent by that person or entity to resume

---

AND UNFAIR COMPETITION § 18.4 ("An assignment in writing is not necessary to transfer common law rights in a trademark."). *See also Absormex S.A. de C.V. v. Paper Source Co.*, 2000 WL 340215 (T.T.A.B. March 30, 2000) ("It is not necessary to have a trademark assignment in writing in order to transfer common law rights in a trademark.") Although there are some indicia that Fitzner, the individual, continued to claim ownership and use the mark following the 1993 transfer, there are also equally clear indications that BFI claimed and exercised these rights.  *See* Dkt. No. 199, Defs./Counter-Pls.' Resp. to Mot. for Summ. Judg. 9 n.3.  Such concurrent use does not necessarily doom the attempted assignment. "An assignment is valid even though it may reserve certain rights of use of the mark in the assignor." McCarthy, § 18:8. Moreover, because Fitzner is and has always been the sole shareholder of BFI, and because customers seeking mortgage services dealt with Fitzner both before and after his incorporation as BFI, without change, there can be no real question of customer confusion, the very finding upon which invalidation would have to be premised. Indeed, Plaintiffs/Counter-Defendants offer no evidence that the public was ever misled as to the source of the mortgage lending services offered by Fitzner/BFI after BFI's incorporation and Fitzner's purported assignment of rights to the Homestead Marks. *See also In re Hand*, 231 U.S.P.Q. 487, 488 1986 WL 83713 (T.T.A.B. July 25, 1986) (where two legal entities "equitably constitute[] a single entity," then use, 1986 WL 83713 by one may inure to the benefit of the other).

17

use in the reasonably foreseeable future." *Stetson v. Howard D. Wolf & Assoc.*, 955 F.2d 847, 850 (2d Cir. 1992). The intent not to resume use of a mark under the Lanham Act contemplates an intent not to resume use within the reasonably foreseeable future, rather than an intent never to resume. *Silverman v. CBS Inc.*, 870 F.2d 40, 46 (2d Cir. 1989) ("[I]f the relevant intent were intent never to resume use, it would be virtually impossible to establish such intent circumstantially. Even after prolonged non-use, and without any concrete plans to resume use, a company could almost always assert truthfully that at some point, should conditions change, it would resume use of its mark."). As expressed in the statute, an intent not to resume may be inferred from the circumstances of a particular case. The burden to prove abandonment rests with the challenger: "[T]he owner of the trademark need only produce evidence to rebut the presumption [of abandonment] while the ultimate burden of persuasion rests on the defendant." *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 938 (7th Cir. 1989). Proof of intent is highly subjective and not, therefore, often amenable to resolution on summary judgment, although "cases that have found no intent to abandon suggest that objective facts can satisfactorily explain non-use to the point where an inference of intent to abandon is unwarranted. And if those facts are undisputed and strongly probative, summary judgment is appropriate. As the Supreme Court has observed, 'Acts which unexplained would be sufficient to establish an abandonment may be answered by showing that there never was an intention to give up and relinquish the right claimed.'" *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980) (quoting *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 31(1900)).

The Lanham Act provides that: "Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration." 15 U.S.C. § 1055. The Lanham Act further defines a related

company as one that is "legitimately controlled" by the trademark owner. 15 U.S.C. § 1127. Thus, use of a mark by a licensee can inure to the benefit of a licensor where sufficient quality control is exercised by licensor over the licensee. "A licensee's use inures to the benefit of the licensor-owner of the mark and the licensee acquires no ownership rights in the mark itself." McCarthy § 18.45.50. An intent to resume use of a mark can be found in continued efforts to license a mark. *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 956 (7th Cir. 1992) ("Karp's efforts to license THIRST-AID to Shasta and Tropicana were sufficient to establish Karp's intent to resume use.").

Plaintiffs/Counter-Defendants argue that Fitzner's intent not to resume use of his mark can be inferred based on the circumstances of his loss of license and failure to take steps to renew that license. In their original motion for summary judgment, their abandonment theory was based on the fact that as of April 22, 2007, Fitzner was no longer a licensed Mortgage Broker in the State of Texas and had taken no steps, despite numerous letters from the State regarding his lack of licensure, to renew or reapply for his expired license. (Dkt. No. 184, Defs./Counter-Pls.' Mot. Summ. Judg. 14-18.) Further, Plaintiffs/Counter-Defendants argued, Mr. Fitzner was not licensed in any other state to provide mortgage broker services. *Id.*[6] Plaintiffs/Counter-Defendants concede that a prima facie case of abandonment cannot be made because three years have yet to elapse since the April 27, 2007 expiration of Fitzner's license. They argued, however, that Fitzner's intent not to resume use of the mark can be inferred from his failure to take steps to obtain a legal license or to otherwise return himself to a status of good standing with the Texas Department of Savings & Mortgage Lending.

---

[6] Plaintiffs/Counter-Defendants also note that BFI has never been licensed to provide mortgage brokerage services, which they argue further supports their argument that the '295 registration, in the name of BFI, was void *ab initio* since it was not filed Fitzner individually, the only entity licensed to provide the service described in the registration.

Defendants/Counter-Plaintiffs responded to the original abandonment argument by stating that non-use, in order to be construed as abandonment, must be accompanied by an intent to abandon and that Fitzner never indicated the requisite intent to abandon his rights in the Homestead mark. Defendants/Counter-Plaintiffs argued that Fitzner was faced with several personal issues during the year 2007 and during that demanding time, he allowed his broker's license to lapse. They further represented that Fitzner had in fact taken steps to reapply for his broker's license and that there was no legal requirement that Fitzner be licensed himself to own the trademark and to license others to use the mark (Plaintiffs/Counter-Defendants do not dispute this). Counsel for Defendants/Counter-Plaintiffs also informed the Court at the hearing on this matter that Fitzner in fact reacquired his Texas license on May 18, 2009. Defendants/Counter-Plaintiffs argued that Fitzner's  intent to continue use of the mark was further made manifest by his licensing of the mark in 2006 to David Faul (in three counties in Texas) and Homestead Mortgage, Inc. (Washington State). Defendants/Counter-Plaintiffs had never disclosed the existence of these licensees during the course of discovery. This "revelation" prompted the Court to order that Plaintiffs/Counter-Defendants be given the opportunity to depose the two previously-disclosed licensees and that Fitzner be required to pay the attorneys fees and costs associated with these depositions based upon his failure to disclose them during the course of discovery. (Dkt. No. 223.)

The Court permitted the parties to file supplemental briefs, addressing these two licensees and the effect that their licensure might have on Plaintiffs/Counter-Defendants' argument that Fitzner had abandoned the mark. Plaintiffs/Counter-Defendants, having deposed the two licensees and having re-deposed Fitzner on the subject of the two licensees, now argue that Fitzner has failed to control the quality of his licensees' services and therefore has engaged in naked licensing and has

20

abandoned the mark. (Dkt. No. 274, Pls./Counter-Defs. Supp. Br. in Supp. Mot. Summ. Judg. 3-5.)

"Failure of a licensor or franchisor to take reasonable measures to control the activities of a

licensee or franchisee with respect to the nature and quality of the goods or services bearing the mark

can result in the loss of trademark rights." Pattishall, Hilliard and Welch, *Trademarks and Unfair*

*Competition*, § 4.05, 66-67 (1996). Failure of a licensor to control the quality of his licensees'

operations increases the risk that the public will be deceived by misuse of those marks:

> The public will be deceived because in the absence of quality control, the licensee's use of the mark misrepresents the trademark owner's connection with the goods or services sold under the licensed mark. A trademark carries with it a message that the trademark owner is controlling the nature and quality of the goods or services sold under the mark. Without quality control, this message is false because without control of quality, the goods or services are not truly "genuine." This dissonance and deception erodes the significance of the designation as an accurate indication of origin: a trademark.

McCarthy § 18.48. *See Ritchie v. Williams*, 395 F.3d 283, 290 (6th Cir. 2000) (lack of control is a

naked license that results in abandonment of the mark). The licensor must take affirmative steps to

control the quality of the goods and services offered by its licensees – the legal right to control is not

sufficient, there must be actual control:

> Clearly the only effective way to protect the public where a trademark is used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees.
>
> The critical question on these facts therefore is whether the plaintiff sufficiently policed and inspected its licensees' operations to guarantee the quality of the products they sold under its trademarks to the public.

*Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959). A challenger

asserting a claim of uncontrolled licensing faces a stringent burden, and must establish that "the

trademark or trade name has lost its significance as an indicator of origin." *Westco Grp., Inc. v. K.B.*

& *Assoc.*, 128 F. Supp. 2d 1082, 1090 (S.D. Ohio 2001) (citing *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir.1997)). *See also U. S. Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 140 (3d Cir. 1981) ("[T]he proponent of a claim of insufficient control must meet a high burden of proof."); McCarthy § 18.48 n. 16, 17 (collecting cases on stringent burden of proof).

"Courts determine whether a licensor has abandoned a trademark or trade name on a case-by-case basis. The degree of control a licensor must exercise to avoid a finding of abandonment necessarily depends on the factual circumstances at hand, including the nature of the trademark or trade name in question." *Westco*, 128 F. Supp. 2d at 1091. In *Westco*, the court found no abandonment through licensing although the licensor never visited or inspected the licensee's retail outlet and played no role in how its licensee handled customer complaints or how it purchased its inventory. *Id.* at 1088. The court concluded that the license requirement that the licensee sell only name brand goods and the licensor's monitoring of compliance with this requirement through industry sources, coupled with assurances from the licensee of strict adherence to the licensor's requirements, was sufficient to demonstrate adequate quality control. *Id.* at 1090. Moreover, the court concluded, even if it found naked licensing as to one retail outlet in a certain  geographic market, this would not necessarily result in diminishing the trademark name in other geographic areas where licensees were adequately controlled. *Id. See also* McCarthy § 18.48 ("[U]ncontrolled licensing in some cases may be of such a limited nature that it has little impact of weakening the mark and thus does not result in a loss of all rights.") "Some courts hold that a finding of uncontrolled licensing should not work a total abandonment of the mark, but a forfeiture of mark rights only in those geographic and product markets where use of the mark has not been adequately controlled." *Id.*

22

Defendants/Counter-Plaintiffs argue that the license agreement itself provides for quality control by the licensor and provides that failure of the licensee to meet the quality standards required by the licensor can result in termination of the license. (Dkt. No. 280, Defs./Counter-Pls.' Supp. Br. Ex. D, ¶ 3.) Licensee Faul specifically testified that he understood that this provision gave Fitzner the right to "do whatever he felt like was necessary to validate whether I was doing business in a manner which he approved of." (Dkt. No. 280, Defs./Counter-Pls.' Supp. Br. Ex. B, Deposition of David Faul, July 14, 2009, 50.) Faul testified that although Fitzner had never visited his location, they spoke on the phone two to three times a year about the business and industry changes and underwriting requirements in the mortgage business. *Id.* at 58. Faul testified that his understanding of the quality demanded by Fitzner was: "That we do business in a legal, ethical, customer-oriented environment and that we adhere to all the state and federal requirements set forth to run the mortgage company." *Id.* at 53. Fitzner testified that he has performed routine quarterly quality control investigations of Faul since 2006, which include verifying state licensing of the licensee, searching the internet to investigate the operation of the business and the backgrounds and activities of the individual brokers and monitoring the marketing of the licensee's services through their websites and making sure that the licensees are using accurate verbiage to reflect the mark. (Dkt. No. 280, Defs./Counter-Pls.' Supp. Br., Ex. A, Deposition of Bobbie R. Fitzner, August 13, 2009, 16-17.) Fitzner also testified that he performs telephone and on-site visits to supplement these quarterly investigations. With respect to Mr. Faul, Fitzner testified that he "regularly, with Mr. Faul, had conversations with him and discussed quality control, and any business-related problems he may have." *Id.* at 18. Fitzner testified that he had never discovered any complaints against Mr. Faul and had every confidence in the quality of the services provided by Mr. Faul.

23

With respect to Mr. Duffy, Fitzner testified that he performed the same quarterly investigations as well as having telephone conversations with Mr. Duffy similar to those held with Mr. Faul. (Dkt. No. 280, Ex. A, Fitzner Dep. 37, 43, 44-45.) Fitzner testified that he conducted a quality control inspection of Duffy at Duffy's location in March or April, 2009, where he announced that he was there on a "QC" visit and spent 25-30 minutes questioning Duffy, based on a form that Fitzner had prepared in advance of the visit, about his business and about Duffy's knowledge of any unauthorized uses of the mark in his territory and whether Duffy had been the subject of any complaints filed with any regulatory agencies or whether the company had been a defendant in any legal actions. *Id.* at 57-59. At that time, Fitzner testified, he had no reason to question the quality of Duffy's services. *Id.* at 61. Recently, however, Fitzner has taken action against Duffy for allegedly allowing another entity to use the Homestead mark. (Dkt. No. 280, Ex. C.) Duffy testified that Fitzner did conduct a site investigation but also testified that Fitzner never provided guidelines for services offered by Duffy, never demanded any changes to Duffy's services and never prescribed the quality of Duffy's services. (Dkt. No. 274, Pls./Counter-Defs.' Supp. Br., Ex. D, Deposition of William Duffy, July 30, 2009, 21-23, 32, 33.)

Plaintiffs/Counter-Defendants argue that these indicia of "control" are insufficient and rely in part on *First Interstate Bancorp v. Stenquist*, 16 U.S.P.Q.2d 1704, 1990 WL 300321 (S.D. Cal. July 13, 1990) where the court found that failures to supervise a licensee's business activities, or to mandate that the licensee utilize certain procedures or materials, constituted uncontrolled licensing although the licensor testified that he had "numerous contacts in person or over the telephone with [the licensee] where they discussed various aspects of the real estate business." *Id.* at 1706-1707. Nor was the court persuaded that control was evidenced by the close personal relationship between

24

the parties and the licensor's trust in the licensee to maintain quality control. *Id.* at 1707. The court noted that while "reliance on the licensee's own quality control is one factor that may be considered, it is not alone sufficient to show that a naked license has not been granted." *Id.* The court found insufficient additional evidence of control. However, a significant distinguishing factor between *Stenquist* and the instant case is that the license agreement itself in *Stenquist* did not contain a quality control provision and in fact contained an explicit disclaimer of the licensor's ability to control activities that were directly related to the quality of the services provided by the licensee. *Id.* at 1706. The court in *Stenquist*, although finding a naked license, recognized that "it is more difficult to set specific standards or quality controls in the context of providing real estate services than where the trademark relates to a discrete product such as a drug or an automobile part." *Id.* Plaintiffs-Counter-Defendants also rely on *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589 (9th Cir. 2002). However that case, like *Stenquist*, involved a license agreement with no quality control provision. *Id.* at 596.[7]

The Court finds this last distinction significant in the instant case and concludes that, given the stringent burden faced by a challenger alleging naked licensing, Fitzner has provided enough evidence of control, in view of the contractual provisions relating to quality control and termination, to survive Plaintiffs/Counter-Defendants' motion for summary judgment on this basis. Fitzner's efforts to control the regulatory and legal compliance of his licensees, in the context of the particular business mortgage brokering, along with his efforts to monitor the verbiage of the mark used to

---

[7] On November 30, 2010, Plaintiffs/Counter-Defendants filed a notice of supplemental authority, bringing to the Court's attention the Ninth Circuit's opinion in *Freecyclesunnyvale v. The Freecycle Network*, __ F.3d __, 2010 WL 4749044 (9th Cir. Nov. 24, 2010). The Court finds that *Freecycle*, a case in which the parties did not have an express licensing agreement and had not agreed to express contractual quality control and termination provisions, is not persuasive here.

market the licensee's services and to investigate potential unauthorized use of the mark by his

licensees, as evidenced by his recent action against Duffy, is sufficient indicia of control to create

a triable issue of fact on this issue.

Nor is the Court persuaded that Plaintiffs/Counter-Defendants have otherwise met their

significant burden to establish abandonment. It is uncontroverted that three years of non-use have

not elapsed (necessary for a *prima facie* case of abandonment) and Defendants/Counter-Plaintiffs

have produced sufficient evidence of an intent to resume, both through evidence of licensing the

mark and through evidence of Fitzner's successful efforts to reapply for his mortgage brokerage

license in the State of Texas. The Court declines to find that Defendants/Counter-Plaintiffs have

abandoned rights to the Homestead mark through naked licensing. The Court denies

Plaintiffs/Counter-Defendants' motion for summary judgment based on a naked assignment or

abandonment (Dkt. No. 184).

> **2.    Defendants/Counter-Plaintiffs lack Article III standing and the Court lacks subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) or, alternatively, the counterclaims should be dismissed because the case is moot. (Dkt. No. 186 and Supplemental Briefs Dkt. Nos. 277, 282 284)**

Plaintiffs/Counter-Defendants argue that the Counterclaims should be dismissed because

Fitzner allowed his Texas broker's license to lapse, has made no effort to reapply and has abandoned

the mark through this non-use and through naked licensing. Relying on *Colbert et al. v. Dymacol,*

*Inc; Intellirisk Mgt. Corp.*, 302 F.3d 155, 158 (3d Cir. 2002), they argue that "it is axiomatic that a

litigation becomes moot and federal jurisdiction is lost when a dispute between the parties no longer

exists **or when a party loses a personal interest in the outcome of the litigation**." (Dkt. No. 186,

Pls./Counter-Defs.' Mot. to Dismiss for Lack of Subject Matter Jurisdiction, 4) (emphasis in

original).  Plaintiffs/Counter-Defendants argue that "Fitzner's own inaction to renew his legally required Texas Mortgage Broker License on April 22, 2007 documents his own loss of interest in the outcome of this litigation." (*Id.*)

As discussed above, Defendants/Counter-Plaintiffs argued in their responsive pleading that "Mr. Fitzner is in the process of becoming relicensed to work as a licensed mortgage broker to resume his broker activities and resume use of his mark personally, and this could occur within the next month." (Dkt. No. 198, Defs./Counter-Pls.' Resp. to Mot. to Dismiss for Lack of Subject Matter Jurisdiction, 11-12; Dkt. No. 200, Ex. H, Declaration of Robert Fitzner, March 25, 2009, ¶ 7.)  At the hearing on this matter, counsel for Defendants/Counter-Plaintiffs informed the Court that Mr. Fitzner in fact reacquired his license in Texas on May 18, 2009.  Defendants/Counter-Plaintiffs also respond that as the owner of a federally registered mark, Fitzner has standing to sue. "If plaintiff is the owner of a federal registration of a mark, it can invoke the subject matter jurisdiction of a federal court for a suit for infringement of that registered mark."   McCarthy § 32.3. Defendants/Counter-Plaintiffs also argue that Plaintiffs/Counter-Defendants offer no authority for the proposition that Mr. Fitzner has to be a licensed broker himself to license his mark, which brings the Court to the final aspect of this argument, which has been fully addressed above, that Fitzner engaged in naked licensing.  The Court has concluded that there is a triable issue of fact on the uncontrolled licensing claim and therefore this argument cannot support Plaintiffs/Counter-Defendants' motion for dismissal based on lack of subject matter jurisdiction.

Plaintiffs/Counter-Defendants further argue that the case is moot because Fitzner has no interest in the outcome of the controversy (the argument rejected above) and Defendants/Counter-Plaintiffs have ceased use of the mark.  They conclude, therefore, that "there is no trademark use by

any of the parties to address in this litigation" and "the case is moot." (Dkt. No. 186, Pls./Counter-Defs.' Mot. to Dismiss, 7, 10-11.) The Court concludes that in light of its finding that issues of fact remain as to whether Fitzner has abandoned the mark, the case has continued vitality, as Plaintiffs/Counter-Defendants concede: "Counter-Plaintiff Fitzner may have had valid rights in parts of Texas based on his use of his mark and subsequent registration. Mr. Fitzner, however has allowed his license to offer the services at issue to lapse and therefore has no ongoing legal use of the marks at issue. All legitimate use has ceased and judicial economy screams for this litigation to end." (*Id.* at 10.) Defendants/Counter-Plaintiffs obviously feel differently and continue to challenge Plaintiffs/Counter-Defendants' past (and they allege continuing) use of the Homestead mark. The Court concludes that it does have subject matter jurisdiction over the case and the case is not moot based upon a purported mutual non-use of the mark. The Court denies Plaintiffs/Counter-Defendants' motion for summary judgment based on lack of subject matter jurisdiction or mootness but agrees, as discussed *infra*, that injunctive relief is unavailable to Defendants/Counter-Plaintiffs because Plaintiffs/Counter-Defendants have ceased all use of the mark.

> **3.    Defendants/Counter-Plaintiffs are precluded from seeking monetary relief by the doctrine of laches and by the fundamental lack of evidence as to damages and Defendants/Counter-Plaintiffs superior rights in certain market areas. (Dkt. No. 187 and Supplemental Briefs Dkt. Nos. 275, 276)**

> **a.    The doctrine of laches in the context of trademark infringement.**

"Because the Lanham Act does not include a limitations period, courts use the doctrine of laches to address the inequities created by a trademark owner who, despite having a colorable infringement claim, allows a competitor to develop its products around the mark and expand its business, only then to lower the litigation boom." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813,

824 (7th Cir. 1999). "In trademark infringement cases, it is almost always laches, not the statute of limitations, that is invoked to determine the availability of both injunctive and monetary relief. . . . Where there is need of a statute of limitations in a suit based on the Federal Lanham Act, courts will look to the relevant forum state statute which best effectuates the federal policy at issue." McCarthy § 31.1. "Laches is an old equitable defense analogous in purpose to the statute of limitations. It is embodied in the venerable maxim that 'Equity aids the vigilant, not those who slumber on their rights.'" McCarthy § 31.1

      "Defendant's proof in its laches defense must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time." McCarthy § 31.1. "'Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.' . . . [L]aches is an equitable defense and ... it can certainly be raised only by one who comes into equity with clean hands." *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 367 (6th Cir. 1984) (quoting in part *United States v. Weintraub*, 613 F.2d 612, 619 (6th Cir. 1979)). *See also Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 320-321 (6th Cir. 2001) ("A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it."). "There is a strong presumption that a plaintiff's delay in bringing suit for monetary relief is not unreasonable as long as the analogous statute of limitations has not lapsed." *Id.* at 321 (internal citation and quotation marks omitted). Under Michigan law, that period is three years. *Id.* Thus, the critical elements of a laches defense are knowledge, delay, prejudice and good faith or clean hands in asserting the defense.

### i.      Knowledge

"A 'reasonably prudent person' standard may be used to impute notice to a plaintiff who claims ignorance of defendant's past conduct." McCarthy § 31.38. The standard for discovery of the allegedly infringing conduct is whether the trademark owner "knew or should have known" of the infringing party's activity. "The objective standard of 'knew or should have known' is a logical implementation of the duty to police one's mark. Nor do we see a principled reason to read the law as distinguishing between inexcusable delay in obtaining knowledge of infringing activity and inexcusable delay *after* obtaining such knowledge." *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1162 (5th Cir. 1982) (emphasis in original). The mere presence of an infringer's mark in a telephone directory will not, standing alone, suffice to put an owner on notice of the infringing use. *Nat'l Trailways Bus Sys. v. Trailway Van Lines, Inc.*, 269 F. Supp. 352, 359 (E.D.N.Y. 1965). However, an owner will be charged with constructive notice "when the defendant's conduct has been open and no adequate justification for ignorance is offered." *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 (2d Cir.1964) (finding that plaintiff was on constructive notice based upon defendant's listing of its allegedly infringing mark in trade journals). "Constructive knowledge is judged from an objective reasonable person standard, and therefore, a trademark owner is chargeable with the information it might have received had due inquiry been made." *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1110 (N.D. Cal. 2008). "The constructive knowledge standard imposes on a trademark owner the duty to police its rights against potential infringers." *Id.* (citing *Grupo Gigante Sa De CV v. Dallo & Co. Inc.*, 391 F.3d 1088, 1102 (9th Cir. 2004) ("[c]ompanies expecting judicial enforcement of their marks must conduct an effective policing effort").

30

Defendants/Counter-Plaintiffs claim that Fitzner was unaware of Plaintiffs/Counter-Defendants' infringing conduct until Fitzner was apprised of this lawsuit in 2005. (Dkt. No. 200, Defs./Counter-Pls.' Resp. to Mot. to Mot. Dismiss, Ex. K, p. 79.) Plaintiffs/Counter-Defendants argue, however, that Fitzner, in the reasonable exercise of diligence in the policing of his mark, should have discovered that in December 1999, Plaintiffs/Counter-Defendants (then Homestead) registered to do business in Texas under the name National Homestead USA, Inc. In January 2000, it registered this assumed name in Bell County and opened an office in that county in the city of Harker Heights.   Between December 1999 and June 2001, Homestead closed 160 loans in Texas and between 2002 and 2004, Homestead ran yellow page advertisements, erected billboards and placed advertisements in the local daily paper.   Homestead closed its Texas location in December, 2004. (Dkt. No. 185, Carr Decl. ¶ 8, Exs. 3, 4.)   Based on this evidence of an obvious and open presence "just 66 miles" from Fitzner's Austin, Texas office, Plaintiffs/Counter-Defendants argue that Fitzner had constructive knowledge of the alleged infringement, particularly in view of Fitzner's claim that he regularly monitored use of the Homestead mark by others.   (Dkt. No. 200, Defs./Counter-Pls.' Resp. to Mot. to Dismiss, Ex. H, Fitzner Decl. ¶ 8.)

In *McDonald's Corp. v. Druck and Gerner, DDS*, 814 F. Supp. 1127, 1138 (N.D.N.Y. 1993) the court found that similar facts, i.e. proximity, extensive advertising and the mark-owner's self-professed policing of its mark, "[made] Plaintiff's self-professed ignorance of Defendant unfathomable."   The Court finds that, "judged from an objective reasonable person standard" Plaintiffs/Counter-Defendants should be "charge[d] with the information it might have received had due inquiry been made." *Saul Zaentz*, 627 F. Supp. at 1110.  Considering that Defendants/Counter-Plaintiffs have recently unearthed no fewer that 29 possible infringers (the sleeping giant having been

awakened by this lawsuit), no reasonable juror could conclude that in regularly policing unauthorized use of their mark as they profess they did, they would have missed Plaintiffs/Counter-Defendants' allegedly infringing activities, particularly the Texas operation "in Defendants/Counter-Plaintiffs' own backyard." The Court concludes that Defendants/Counter-Plaintiffs had constructive knowledge of Plaintiffs/Counter-Defendants' use of the Homestead mark.

### ii.    Delay

Plaintiffs/Counter-Defendants claim that Defendants/Counter-Plaintiffs sat on their rights for seventeen years, utilizing Plaintiffs/Counter-Defendants' 1987 first use as the beginning of the running of the period of delay. But this claims too much, as Plaintiffs/Counter-Defendants have offered no evidence of Defendants/Counter-Plaintiffs' knowledge of Plaintiffs/Counter-Defendants' use of the mark outside the State of Texas, a use which began at the earliest in 1999. In January, 2005 Defendants/Counter-Plaintiffs filed their counterclaim in this case, a period of six years, well beyond the lapse of the analogous three year period of limitations as to Plaintiffs/Counter-Defendants' 1999 registration to do business under the Homestead name, as to the 2000 registration of the assumed name in a county just 66 miles from Defendants/Counter-Plaintiffs' Austin, Texas office and as to the closing of over 160 loans in neighboring counties. While some of the advertising is alleged to have occurred within the three year period, the Court concludes that Plaintiffs/Counter-Defendants have alleged sufficient facts to establish that Defendants/Counter-Plaintiffs waited well over three years beyond the time that they should have discovered the alleged infringing use to bring this action.

### iii.    Prejudice

Plaintiffs/Counter-Defendants argue that Defendants/Counter-Plaintiffs' delay in asserting

their rights has resulted in prejudice to Plaintiffs/Counter-Defendants who have now invested time, money and effort in marketing and expanding their mark presuming their use to be non-infringing. "Laches is a good defense if plaintiff's long failure to exercise its legal rights has caused defendant to rely to its detriment by building up a valuable business around its trademark." McCarthy § 31.12. "The trademark owner's delay in asserting his rights may lead the defendant to build up innocently an important reliance on the publicity of his mark so that its loss would cost dearly [and] prejudice can result from a defendant committing itself to an expensive advertising and marketing format and strategy." *Id. See also McDonald's,* 814 F. Supp. at 1138 ("commonly cited criteria of prejudice are the expenditure of significant amounts for the advertising and promotion of the mark or a general business expansion as a result of the increased demand for the product being sold under the mark in question") (internal quotation marks and citation omitted).

Plaintiffs/Counter-Defendants allege that they "spent a significant amount of funds marketing and advertising the Homestead Marks," in excess of $412,000, but they concede that most of their marketing efforts were made in Michigan. (Dkt. No. 185, Carr. Decl. ¶ 10.) Because, as discussed *infra*, the only claims that Defendants/Counter-Plaintiffs will have against Plaintiffs/Counter-Defendants will arise out of Plaintiffs/Counter-Defendants' marketing and use of the mark in Texas, which ceased in 2004, the amounts spent by Plaintiffs/Counter-Defendants in building up the reputation of their mark in Michigan (or Indiana, Ohio and Wisconsin) cannot form the basis for their claim of prejudice in building the reputation of their mark in Texas. As to those efforts and related amounts, the prejudice appears to be negligible, i.e. registration fees, yellow page and advertising costs for two years and the purchase of a billboard. Plaintiffs/Counter-Defendants also claim that they will be prejudiced by having to reach back seventeen years to establish prejudice but,

33

as the Court has concluded, they need only reach back to the year 1999. The Court concludes that Plaintiffs/Counter-Defendants have not established the element of prejudice, and, in any event, their affirmative defense of laches is barred by their own alleged lack of good faith.

### iv. Plaintiffs/Counter-Defendants' good faith in utilizing the mark in Texas.

Even assuming that Plaintiffs/Counter-Defendants could prove that Defendants/Counter-Plaintiffs knew of their use of the mark in Texas as early as 1999 and waited six years to bring this suit, and even assuming that Plaintiffs/Counter-Defendants could establish prejudice based on that delay, the Court finds that there remains a genuine issue of material fact as to whether Plaintiffs/Counter-Defendants' expansion of their business into Texas in 1999, just after their 1998 application for a federal registration was denied based on likelihood of confusion with Defendants/Counter-Plaintiffs' federally registered mark, was undertaken in good faith. This finding is fatal to Plaintiffs/Counter-Defendants' laches defense.

Plaintiffs/Counter-Defendants assert, in various pleadings, that although they knew that their 1998 application had been denied, they were never informed by their intellectual property lawyer of the reason for the denial and therefore continued to use the mark assuming that they could rely on their own long-time superior use of the mark.   (Dkt. No. 185, Carr Decl. ¶ 11.)  However, this statement by Mr. Carr is contradicted by his deposition testimony where he responded as follows to question from counsel regarding the 1998 denial of his application for federal registration:

> Q:    You don't know of any issues relating to the use of Homestead Mortgage Company in the state of Texas that would drive you to say, call it National Homestead, U.S.A., correct?
>
> A:    I thought we talked about that. Wasn't there a document from the state that wouldn't let us use Homestead?

          *              *            *

Q:     We have the document from the federal government.

A:     That's the one I am referring to.

Q:     So, that because of the document from the federal government, you thought you could get around it by calling it National Homestead U.S.A., Inc.

A:     It would appear so.

(Dkt. No. 200, Defs./Counter-Pls.' Resp. to Mot. to Dismiss, Ex. D, Deposition of Dennis Carr, March 7, 2006, p. 101.)  This conflict in testimony, along with the inherent implausibility of Plaintiffs/Counter-Defendants' assertion that they never inquired of their intellectual property attorney the reason for the denial, creates a genuine issue of material fact as to Plaintiffs/Counter-Defendants' good faith in its 1999 use of the Homestead Mark in Texas.[8]  The Court denies Plaintiffs/Counter-Defendants' motion for partial summary judgment as to monetary relief on Defendants/Counter-Plaintiffs' counterclaim on the basis of laches.

**b.**      **The absence of evidence as to actual injury.**

Plaintiffs/Counter-Defendants argue that Defendants/Counter-Plaintiffs are not entitled to any monetary relief because they have offered no evidence of any actual injury as a result of the alleged infringement. (Dkt. No. 187, Pls./Counter-Defs.' Mot. for Summ. Judg. 8-12.) Specifically, they argue that "Fitzner has not offered any evidence that he lost any business, or even a single loan, as a result of AssuraFirst's use of the Homestead Marks. Fitzner has not offered any evidence that

---

[8] As the Court concludes *infra*, Plaintiffs/Counter-Defendants' rights to utilize the mark are superior to Defendants/Counter-Plaintiffs in all geographic territories where Plaintiffs/Counter-Defendants were using, or could reasonably have expanded such use, when Defendants/Counter-Plaintiffs registered their mark in 1996.  The only area of possible infringement of Defendants/Counter-Plaintiffs superior rights in this case is the State of Texas.

his goodwill was damaged or that he has spent any money on corrective advertising or that any is necessary." (*Id.* at 9.) *Schneider Saddlery Co., Inc. V. Best Shot Pet Pdcts. Int'l, LLC*, No. 06-cv-02602, 2009 WL 864072 (N.D. Ohio March 31, 2009) and *Powerhouse Marks, LLC v. Chi Hsin Impex, Inc., et al.*, No. 04-73923, 2006 U.S. Dist. LEXIS 4021 (E.D. Mich. Feb. 2, 2006) address this issue directly and instruct that the Lanham Act requires proof of some injury (though not in an exact amount) for an award of monetary damages based on damage to goodwill or corrective advertising, but that such a showing is not necessarily required to recover lost profits.

Even assuming that Defendants/Counter-Plaintiffs could establish infringement in some geographic territory, proof of infringement alone is insufficient to support an award of damages. "[W]hile [Defendants/Counter-Plaintiffs] need not demonstrate 'the exact amount of damages' or actual consumer confusion, [Defendants/Counter-Plaintiffs] must demonstrate some damage to itself to be entitled to this form of monetary relief." *Schneider*, 2009 WL 864072 at * 18 (citing *Jeffrey Chain, L.P. v. Tropodyne Corp.*, No. 99-6268, 2000 U.S. App. LEXIS 33926 at * 13 (6th Cir. Dec. 20, 2000) *cert denied Chain v. Tropodyne Corp.*, 533 U.S. 931 (2001)). Once plaintiff demonstrates *some* damage, he need not precisely quantify that damage but must proffer evidence of evidentiary quality to allow a reasonable juror to connect damage of some sort with the alleged infringement. *Id.* at 19. The court in *Schneider* also noted that it is not incumbent on the court to search the record for such evidence but that the court must be directed to "some piece of evidence which might stave off summary judgment." *Id.* (quoting *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir. 1997)). In *Schneider*, the court held that the plaintiff barely survived summary judgment with the testimony of one witness that he observed "a drop in sales in the one catalog where Schneider and Best Shot competed." *Id.* Defendant did not deny the drop in sales or deny that

36

there was record evidence of the drop but rather argued that a one-year drop in sales was insufficient as a matter of law to establish damages. *Id.* The court held: "Although this is an unquestionably close call, evidence of a decrease in sales in the one forum where the products compete side-by-side might sustain a claim for damages." *Id.*

Similarly, in *Powerhouse*, the court noted that while the Sixth Circuit has held that actual consumer confusion need not be demonstrated to support a claim for monetary damages, "[t]o be entitled to damages, the plaintiff must prove that 'some damages were the certain result of the wrong.'" 2006 US Dist. LEXIS 4021 at * 4 (quoting *Jeffrey Chain, supra* at * 4). The court found that plaintiff had presented no evidence that consumers had associated the defendant's allegedly inferior products with plaintiff's mark (no evidence of loss of goodwill), no evidence that plaintiff had suffered any damage that needed correcting or that plaintiff had expended any funds to control any damage caused by the alleged confusion (no evidence of corrective advertising costs) and minimally sufficient evidence of lost royalties as to one defendant only. *Id.* at * 7-9.

Defendants/Counter-Plaintiffs have presented absolutely no evidence of loss of goodwill or expenditure of funds for corrective advertising. All they have offered is Fitzner's opinion, without supporting evidence, that "[i]t is his opinion that [he] must engage in corrective advertising to negate confusion between the marks used by Plaintiffs/Counter-Defendants and my federally registered HOMESTEAD MORTGAGE mark." (Dkt. No. 200, Defs./Counter-Pls.' Resp. to Mot. for Summ. Judg. Ex. H, Fitzner Decl. ¶ 15.) This is not evidence of evidentiary quality demonstrating the existence of damage - this is Fitzner's unsupported opinion without reference to one lost customer or loan or drop in profit – this simply does not suffice to defeat summary judgment. Nor is the Court persuaded by Fitzner's deposition testimony about "some confused consumers" which fails to even

identify the entity by which these consumers alleged to have been confused.  (Dkt. No. 200, Defs./Counter-Pls.' Resp. to Mot. for Summ. Judg. Ex. K.)  Given the fact that Plaintiffs/Counter-Defendants ceased use of the mark in Texas (the only area where Defendants/Counter-Plaintiffs could possibly claim infringement) in 2004, the Court can conceive of no future instance which might call for the expenditure of corrective advertising funds nor of goodwill that may be lost at some future date.  Defendants/Counter-Plaintiffs do not identify one loan or customer lost or confused or even a single "drop in profit," such as saved the plaintiff's claim by a thread in *Schneider.*

Defendants/Counter-Plaintiffs spend much of their argument attempting to convince the Court that they need not demonstrate actual confusion in order to recover monetary damages - a proposition which the Court accepts.  On the issue of corrective advertising, Defendants/Counter-Plaintiffs direct the Court to the money that Plaintiffs/Counter-Defendants spent in Michigan in marketing the Homestead mark for their own purposes as somehow supporting Defendants/Counter-Plaintiffs entitlement to corrective advertising "to transfer this goodwill to Counter-Plaintiffs." (Dkt. No. 200, Defs./Counter-Pls.' Resp. to Mot. for Summ. Judg. 15.)  This is not evidence of damage to Defendants/Counter-Plaintiffs or evidence of money that they have spent (or will be required to spend) to control damage (not in evidence) allegedly caused to the reputation of their mark in Texas. Defendants/Counter-Plaintiffs have provided no evidence of any damage that needs correcting. *Powerhouse, supra* at * 8.

The closest that Defendants/Counter-Plaintiffs come to providing a glimmer of evidence which might sustain their burden is Fitzner's declaration that he "had inquiries about licensing" his mark but "has not been able to complete the transactions due to confusion in the market caused by

38

use of Plaintiffs/Counter-Defendants of a confusingly similar mark and the resolution of this lawsuit." (Dkt. No. 200, Defs./Counter-Pls.' Resp. to Mot. for Summ. Judg. Ex. H, ¶ 16.)  But even this allegation falls short as it does not identify one actual inquiry nor does it specify the market involved, making it impossible for the Court to determine if the alleged lost licensee was even in a market in which Defendants/Counter-Plaintiffs could claim superior rights.  In contrast, in *Schneider*, the court was at least able to determine that the claimed one year drop in profit related to the one catalog in which plaintiff and defendant were in competition.  Defendants/Counter-Plaintiffs have not produced evidence of actual damage sufficient to survive Plaintiffs/Counter-Defendants' motion for summary judgment on Defendants/Counter-Plaintiffs' counterclaim for monetary damages based upon lost goodwill, lost or suppressed royalties or corrective advertising.  The Court concludes that Defendants/Counter-Plaintiffs are not entitled to an award of monetary damages based upon claimed lost goodwill, lost or suppressed royalties or corrective advertising.

This leaves only Defendants/Counter-Plaintiffs' claim for Plaintiffs/Counter-Defendants' profits.  Again, Defendants/Counter-Plaintiffs spend significant effort arguing that they need not demonstrate bad faith in order to recover lost profits, a proposition which the Court accepts.  *See Powerhouse, supra* at * 11 (finding that although not established precedent, the Sixth Circuit would likely join the Fifth and Third circuits in concluding that evidence of bad faith is not a prerequisite to disgorgement of profits).  The Court does conclude, however, that proof of some actual damage, required for proof of recovery of monetary damages, is not necessarily required for recovery of lost profits. *See Powerhouse, supra* at * 71 (holding that plaintiff need not show an actual diversion of sales to recover profits from the alleged infringer).  However, on this point of proof, Defendants/Counter-Plaintiffs would be limited to evidence of profits that Plaintiffs/Counter-

39

Defendants may have reaped in territories where Defendants/Counter-Plaintiffs arguably had

superior trademark rights, i.e. Texas. Plaintiffs/Counter-Defendants assert that Defendants/Counter-

Plaintiffs are not "entitled to recover profits earned by AssuraFirst in states in which it was lawfully

licensed to provide mortgage brokerage services and Fitzner was not." The Court agrees and

Defendants/Counter-Plaintiffs have provided no authority to support such a claim. The Court

concludes that any award of lost profits to which Defendants/Counter-Plaintiffs might be entitled

must be limited to those profits which Plaintiffs/Counter-Defendants may have earned in territories

where Defendants/Counter-Plaintiffs may be able to establish that they had rights superior to

Plaintiffs/Counter-Defendants, i.e. Texas.[9]

> c. **Defendants/Counter-Plaintiffs cannot recover for conduct occurring prior to June 26, 2001, the date on which GRL and AssuraFirst acquired the assets of Homestead Mortgage**

The parties agree that the test for successor liability is as set forth by the Michigan Supreme

Court in *Foster v. Cone-Blanchard Machine Co.*, 460 Mich. 696 (1999):

> The traditional rule of successor liability examines the nature of the transaction between predecessor and successor corporations. If the acquisition is accomplished by merger, with shares of stock serving as consideration, the successor generally assumes all its predecessor's liabilities. However, where the purchase is accomplished by an exchange of cash for assets, the successor is not liable for its predecessor's liabilities unless one of five narrow exceptions applies. The five exceptions are as follows:
>
>> "(1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a

---

[9] The Court notes that in *Powerhouse* the court denied an award of profits based upon an absence of a finding of bad faith. As discussed *supra*, there is a genuine issue of material fact as to Plaintiffs/Counter-Defendants good faith in entering the Texas market after the 1998 denial of its application for federal registration. This finding precludes the Court from entertaining this equitable argument with respect to Defendants/Counter-Plaintiffs' claim for lost profits.

purchase in good faith **510 were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.

460 Mich. at 702. Defendants/Counter-Plaintiffs argue that the fifth exception is applicable here and that the 2001 transaction represented merely a re-creation of the former entity. Plaintiffs/Counter-Defendants do not even address this argument in their reply brief and the Court concludes that this argument presents material issues of fact not capable of resolution on summary judgment.

**B.    Defendants/Counter-Plaintiffs Motion for Summary Judgment and Injunctive Relief (Dkt. No. 184)[10]**

Defendants/Counter-Plaintiffs motion for summary judgment and for injunctive relief proceeds on the mistaken assumption that its federally registered mark gives it rights superior to all the world - including prior first users. This is a fundamental misunderstanding of applicable trademark principles which, in this case, dictate that, as this Court ruled years ago in granting preliminary injunctive relief, Plaintiffs/Counter-Defendants' rights to the Homestead mark are superior to Defendants/Counter-Plaintiffs' in all areas where they were using the mark (or reasonably could be expected to expand) at the time that Defendants/Counter-Plaintiffs registered their mark in 1996. Therefore, Defendants/Counter-Plaintiffs have very little likelihood of success on the merits of their claim in any geographic region other than Texas. Further, there is no chance of irreparable harm that could result if the Court fails to issue an injunction because Plaintiffs/Counter-Defendants ceased use of the Homestead mark in Texas in 2004. Because Plaintiffs/Counter-

---

[10] Defendants/Counter-Plaintiffs seek an award of attorneys' fees, arguing that this case presents exceptional circumstances or malice, fraud and deliberate and wilful conduct. The Court agrees that the "universe" of this case arguably involves all of these elements, but would be hard pressed to attribute such conduct to one side as opposed to the other. The Court denies Defendants/Counter-Plaintiffs' request for attorneys' fees.

Defendants have not used the Homestead mark in Texas since 2004, there is likely to be no impact on the public as there is no likelihood of confusion where there is no concurrent use and has been no concurrent use since 2004.  The public interest does not, therefore, favor the granting of an injunction and the Court denies Defendants/Counter-Plaintiffs' motion for a preliminary injunction and also denies Defendants/Counter-Plaintiffs' motion for summary judgment.

"The territorial rights of a holder of a federally registered trademark are always subject to any superior common law rights acquired by another party through actual use prior to the registrant's constructive use." *Allard Ents., Inc. v. Advanced Programming Resources, Inc.*, 249 F.3d 564, 572 (6th Cir. 2001).  Federal registration of a trademark or service mark does not displace the rights and priority of others who have previously used the mark in commerce.  In such a case, the one to first use the mark is the "senior user" and the federal registrant is the "junior user," whose rights are inferior to the senior user but only to the extent of the prior first use: "In the case in which a junior user applies for registration, however, the extent of the senior user/non-registrant's territory is frozen in time as of the date of the actual registration to the junior user." *Id.* "The key question," is "the correct geographic extent of that superior right." *Id.*  The senior user is not limited to his territory of "actual" use but is also permitted to claim superior rights within "a zone of natural expansion." *Id.* at 574. "Where a party has submitted evidence sufficient to prove a strong probability of future expansion of his trade into an area, that area would then become an area of likelihood of confusion if a registration covering it was granted to another party." *Id.* at 574 (quoting *In re Beatrice Foods Co.*, 57 C.C.P.A. 1302, 429 F.2d 466, 475 (1970)).  Thus, the Court must determine whether Plaintiffs/Counter-Defendants were first to use the Homestead mark and, if so, what is the correct geographic extent of their superior right.

"The elements of the § 15 prior use defense are (1) acquisition of trademark rights under state law prior to the date of the incontestable registration; (2) continuance of use of the trademark from that date; and (3) that the prior use is on goods or services which are in issue in the case and infringement is proven. If the defense is proven, the defendant/prior user may continue its use in its territory only on the goods with respect to which the prior use was proved." McCarthy § 26.53. A mark is "used" in commerce if it is utilized in connection with a commercial transaction and the use need not be extensive: "As long as there is a genuine use of the mark in commerce, however, ownership may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition." *Allard Ents., Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350, 358 (6th Cir. 1998).

In the instant case, it is uncontested that Plaintiffs/Counter-Defendants began using the Homestead mark when Homestead Mortgage Company was formed in the State of Michigan on March 31, 1987. (Dkt. No. 185, Carr. Decl. ¶ 2.) Homestead Mortgage, or its successors in interest GRL and AssuraFirst, made continuous use of the mark until sometime in early 2005. (*Id.* ¶¶ 3-4.) In 1988, Plaintiffs/Counter-Defendants recorded loans in Michigan in Macomb, Oakland, Saint Clair and Wayne Counties. By 1996, Homestead had recorded loans in sixty-eight (68) of the eighty-three (83) counties in Michigan.  Also, by 1996, Plaintiffs/Counter-Defendants had recorded 1791 mortgages in the State of Indiana and 187 loans in the State of Florida. (*Id.* ¶ 5.) From 1988-1996, Plaintiffs/Counter-Defendants recorded 17,284 loans in the State of Michigan. (*Id.* ¶ 5, Ex. 1.) By 1996, Plaintiffs/Counter-Defendants had also closed loans in the states of Arizona, Colorado, Illinois, Kentucky, Missouri, North Carolina, Ohio, Tennessee, Virginia and Wisconsin, and had sales offices in Indiana and Ohio, although most mortgages were administered in Michigan. (*Id.* ¶¶

43

2:04-cv-74842-PDB-MKM   Doc # 291   Filed 12/27/10   Pg 44 of 45   Pg ID 5577

6-7.) Plaintiffs/Counter-Defendants' revenues grew from $1,232,866 in 1988 to $10,106,323 in 1995 and $12,898,602 in 1996. (*Id.* ¶ 9, Ex. 5.)

Based on this uncontroverted evidence, the Court concludes that Plaintiffs/Counter-Defendants are the senior users of the Homestead mark in the geographic areas where they were operating or where they had "a strong probability of future expansion." Loan numbers in Palm Beach, Florida doubled from 1995 to 1996 and loan numbers in Indiana remained steady during these years. The Court finds that Florida and Indiana were within the probable zone of expansion and concludes, therefore, that Plaintiffs/Counter-Defendants' geographic territory of prior use includes the entire State of Michigan as well as those counties in Florida and Indiana where it had significant penetration. (*See* Dkt. No. 185, Carr Aff. Ex. 2.) The full extent of this "zone of probable expansion" is less significant here, where Plaintiffs/Counter-Defendants have stopped using the mark altogether and Defendants/Counter-Plaintiffs do not claim to have attempted to use the mark in any States other than Michigan, Texas, and by its 2006 licensee, Washington.

Because Plaintiffs/Counter-Defendants rights are superior to Defendants/Counter-Plaintiffs' rights in the entire State of Michigan, and because Defendants/Counter-Plaintiffs have provided no evidence of continued use of the mark by Plaintiffs/Counter-Defendants in any area in which Defendants/Counter-Plaintiffs would have rights superior to Plaintiffs/Counter-Defendants', the Court denies Defendants/Counter-Plaintiffs' request for injunctive relief. The Court also denies Defendants/Counter-Plaintiffs' motion for summary judgment on their counterclaims, finding genuine issues of material fact as to Defendants/Counter-Plaintiffs' claims of infringement of their mark based upon Plaintiffs/Counter-Defendants' entry into the Texas market in 1998. Assuming a finding of liability, proof as to damages will be limited as described in this Order.

44

## IV.   CONCLUSION

For the foregoing reasons, the Court:

(1) **DENIES** Plaintiffs/Counter Defendants' Motion for Summary Judgment (Dkt. No. 184);

(2) **GRANTS IN PART AND DENIES IN PART** Plaintiffs/Counter-Defendants' Motion to Dismiss and/or for Summary Judgment (Dkt. No. 186);

(3) **GRANTS IN PART AND DENIES IN PART** Plaintiffs/Counter-Defendants' Motion for Partial Summary Judgment (Dkt. No. 187); and

(4) **DENIES** Defendants/Counter-Plaintiffs' Motion for Summary Judgment and Injunctive Relief (Dkt No. 182.)

**IT IS SO ORDERED.**

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:   DEC 27 2010

PURSUANT TO RULE 77 (d), FED. R. CIV. P.
COPIES MAILED TO ATTORNEYS FOR ALL
PARTIES ON ___ DEC 27 , 20 10

DEPUTY COURT CLERK