UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FEDERAL DEPOSIT INSURANCE CORPORATION,
as Receiver for GUARANTY RESIDENTIAL LENDING,
INC., a Nevada Corporation, and
ASSURAFIRST FINANCIAL COMPANY,
a Michigan Corporation d/b/a HOMESTEAD
USA and HOMESTEAD MORTGAGE                     Case No. 04-74842

      Plaintiffs, Counter-Defendants,          Paul D. Borman
      Cross-Plaintiffs                          United States District Judge

-vs-

                                        Mona K. Majzoub
HOMESTEAD MORTGAGE COMPANY,                    United States Magistrate Judge
L.L.C., a Michigan Corporation

      Defendant, Counter-Plaintiff, and

BOB FITZNER d/b/a HOMESTEAD
MORTGAGE CO., an Individual

      Counter-Plaintiff, Cross-Defendant.
_____/

OPINION AND ORDER
(1) GRANTING IN PART AND DENYING IN PART DEFENDANTS/COUNTER-
PLAINTIFFS' MOTION FOR RECONSIDERATION (DKT. NO. 292); AND
(2) AMENDING THE COURT'S DECEMBER 27, 2010
OPINION AND ORDER (DKT. NO 291)

This matter is before the Court on Defendants/Counter-Plaintiffs' Motion for

Reconsideration of this Court's December 27, 2010 Opinion and Order. (Dkt. No. 292.) Pursuant

to E.D. Mich. L.R. 7.1(h)(2), no response is permitted and no hearing on the motion will be held.

I.      INTRODUCTION

On December 27, 2010, this Court entered its Opinion and Order denying in part and

granting in part various motions for summary judgment and or to dismiss.  (Dkt. No. 291.)

Defendants/Counter Plaintiffs now move the Court to reconsider that portion of its Opinion and

Order which held that Defendants/Counter-Plaintiffs' claims for monetary relief are limited to lost

profits from the use of the Homestead mark in Texas.  (Dkt. No. 292.)  For the reasons that follow,

the Court GRANTS IN PART AND DENIES IN PART Defendants/Counter-Plaintiffs' motion for

reconsideration and AMENDS its December 27, 2010 Opinion and Order.

## II.      STANDARD OF REVIEW

Motions for reconsideration are governed by E.D. Mich. LR 7.1(h)(3), which states in

pertinent part:

> Generally, and without restricting the court's discretion, the court will not grant
> motions for rehearing or reconsideration that merely present the same issues ruled
> upon by the court, either expressly or by reasonable implication. The movant must
> not only demonstrate a palpable defect by which the court and the parties and other
> persons entitled to be heard on the motion have been misled but also show that
> correcting the defect will result in a different disposition of the case.

E.D. Mich. L.R. 7.1(h)(3).  "A 'palpable defect' is a defect which is obvious, clear, unmistakable,

manifest, or plain." *Ososki v. St. Paul Surplus Lines Ins. Co.*, 162 F. Supp. 2d 714, 718 (E.D. Mich.

2001).  "[A] motion for reconsideration is not properly used as a vehicle to re-hash old arguments

or to advance positions that could have been argued earlier but were not." *Smith v. Mount Pleasant

Public Schools*, 298 F. Supp. 2d 636, 637 (E.D. Mich. 2003).  The Court need not consider evidence

submitted in support of a motion for reconsideration that was available at the time the movant

responded to a motion for summary judgment but was not presented to the Court.  *Basinger v. CSX

Transportation, Inc.*, No. 94-3908, 1996 WL 400182 *3 (6th Cir. July 16, 1966) (finding no abuse

of discretion where district court declined to consider, on a Rule 59(e) motion, evidence that was

available but not presented at the time the moving party contested summary judgment). "Motions

for reconsideration likewise do not permit the losing party to attempt to supplement the record with

previously available evidence." *Allen v. Henry Ford Health Sys.*, No. 08-14106, 2010 WL 653253

\* 1 (E.D. Mich. Feb. 19, 2010) (citing *Basinger, supra*).

III.    ANALYSIS

        **A.**       **Alleged Palpable Defect Number One: That the Court Made the Incorrect Factual Determination that Plaintiffs/Counter-Defendants' Texas Operations Ceased in December, 2004.**

In support of their argument that the Court has committed a palpable defect in determining

that Plaintiffs/Counter-Defendants' Texas operations ceased in December 2004,

Defendants/Counter-Plaintiffs provide the Court with evidence from the record which has been

available to them all along but that was not designated or discussed in any of their responsive briefs

on the issue of their entitlement to monetary relief.

Bruce Carr, in his Declaration filed in support of Plaintiffs/Counter-Defendants' motion for

summary judgment as to monetary relief, stated that the Harker Heights, Texas office remained open

until December, 2004. (Dkt. No. 185, Carr Decl. ¶ 9.)   In their responsive briefs,

Defendants/Counter-Plaintiffs never contested this statement, which the Court relied on as

undisputed in its Opinion and Order. The Court is unable to locate any reference, in any of the

Defendants/Counter-Plaintiffs' responses to the motion for summary judgment as to monetary relief,

to the now-proffered Carr testimony regarding the Harker Heights office "continuing to run" at the

time of his deposition in 2006.   Defendants/Counter-Plaintiffs could have, but did not, bring this

evidence to the Court's attention in the extensive briefing on which the Court based its Opinion and

Order and the Court is not obligated to consider it now.  *See Basinger*, 1996 WL 400182 at \*3;

*Allen*, 2010 WL 653253 at * 1.  Despite Defendants/Counter-Plaintiffs' failure to bring this evidence

to the Court's attention at the appropriate stage of the proceedings, the Court will GRANT

Defendants/Counter-Plaintiffs' motion for reconsideration of the factual determination that

Plaintiffs/Counter-Defendants' Texas operations ceased in December, 2004 and will permit

Defendants/Counter-Plaintiffs to attempt to establish the limited allegation that the

Plaintiffs/Counter-Defendants' Harker Heights office continued to operate after December, 2004.

> **B.      Alleged Palpable Defect Number Two: That the Court Impermissibly Limited Defendants/Counter-Plaintiffs Recovery of Plaintiffs/Counter-Defendants' Lost Profits to Business Done Only in the State of Texas**

Prior to filing their motion for reconsideration, Defendants/Counter-Plaintiffs' argument has

focused the Court's attention on Plaintiffs/Counter-Defendants' conduct in expanding the use of the

Homestead mark into the State of Texas after Plaintiffs/Counter-Defendants' allegedly had

knowledge that Fitzner and his Texas corporation had federally registered a confusingly similar

mark.      In describing Plaintiffs/Counter-Defendants' allegedly "wilful infringement,"

Defendants/Counter-Plaintiffs stated  the following as examples: (1) "It must be emphasized that

Counter-Defendants were only using variations of the HOMESTEAD MARK in significantly

limited territories, **not including Texas,**   when Defendants/Counter-Plaintiffs applied for and

received their federal registration of the mark;" (emphasis in original) (2) "Even after learning about

Counter-Plaintiffs' registered mark, and the Trademark Office finding of a likelihood of confusion,

Counter-Defendants expanded their business into Texas under the name National Homestead USA,

Inc.;" (3) "Even though Counter-Defendants had knowledge of the HOMESTEAD MORTGAGE

registration, AssuraFirst's predecessor began closing mortgage loans in Texas in 1999 under the

mark HOMESTEAD USA."  (Dkt. No. 200, Defs.'/Counter-Pls.' response to Pls.'/Counter-Defs.'

4

motion for summary judgment as to monetary relief, pp. 4-5.)

In their motion for reconsideration, Defendants/Counter-Plaintiffs shift their focus to Plaintiffs/Counter-Defendants' activities in other markets, beyond the State of Texas (the only market where Fitzner had ever used or licensed or attempted to use or license his mark prior to the initiation of this lawsuit) again attaching documents not originally offered in support of their opposition to summary judgment on this issue. Because Defendants/Counter-Plaintiffs focused on Plaintiffs/Counter-Defendants' conduct in entering the State of Texas in responding to the motion to preclude their claim for lost profits, the Court did not set forth a rationale for impliedly declining to permit Defendants/Counter-Plaintiffs to proceed with their claim for a share of Plaintiffs/Counter-Defendants' profits in markets outside the State of Texas. It does so here, in denying Defendants/Counter-Plaintiffs' motion for reconsideration of this ruling, and also amends its previous Order by adopting its expanded discussion of the issue in this Opinion and Order.

"Section 1117(a) remedies are awarded 'subject to the principles of equity.' Thus, an award of the defendant's profits is not automatic." *Quick Technologies, Inc. v. The Sage Grp. PLC*, 313 F.3d 338, 349 (5th Cir. 2002). "It is important to remember that the remedy of an accounting of profits has its historic roots in equity jurisprudence. Therefore, it retains a strong flavor of equitable discretion. An accounting of profits is never automatic. The courts carefully retain the right to withhold the remedy if, in view of the overall facts and equities of the case, it is not appropriate." MCCARTHY ON TRADEMARKS § 30.59 (4th ed. 2008). The Lanham Act is intended to be compensatory and never punitive. "§ 35(a) of the Lanham Act makes clear that an award of damages shall be subject to the principles of equity but also states that the award is to constitute compensation and not a penalty.'" *Balance Dynamics Corp. v. Schmitt Ind., Inc.*, 204 F.3d 683, 695

(6th Cir. 2000). "'[T]he Lanham Act ... expressly confers upon district judges wide discretion in determining a just amount of recovery for trademark infringement.'" *LaQuinta Corp. v. Heartland Properties, LLC*, 603 F.3d 327, 342 (6th Cir. 2010) (citing *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1564 (11th Cir. 2010)).

In their motion for reconsideration, Defendants/Counter-Plaintiffs discuss at great length the legal authority that should guide the Court in determining the territorial scope of trademark rights of competing claimants to a contested mark. (Defs.'/Counter-Pls.' Mot. Recon. 5-7.) Determining superiority of trademark rights, however, does not answer the separate question of whether a plaintiff who establishes infringement is entitled, on balance of the equities of the case, to the extreme remedy of recovering an alleged infringer's profits. Even assuming that Defendants/Counter-Plaintiffs could establish superior rights to the Homestead mark in one or more of the non-Texas markets identified in Defendants/Counter-Plaintiffs' motion for reconsideration, this would not automatically entitle them to a share of Plaintiffs/Counter-Defendants' profits in those markets, markets which admittedly Defendants/Counter-Plaintiffs have never served or attempted to serve.

In weighing the equities in a particular case and considering the extent of an appropriate damage award under the Lanham Act, the Sixth Circuit has encouraged consideration of "a wide range of factors including, inter alia, the defendant's intent to deceive, whether sales were diverted, the adequacy of other remedies, any unreasonable delay by the plaintiff in asserting its rights, the public interest in making the misconduct unprofitable, and 'palming off' i.e., whether the defendant used its infringement of the plaintiff's mark to sell its own products to the public through misrepresentation." *LaQuinta*, 603 F.3d at 343 (citing *Synergistic Int'l, LLC v. Korman*, 470 F.3d

162, 175-176 (4th Cir. 2006), which adopted the multi-factor test set forth in *Quick Technologies,* 313 F.3d at 349 (finding the following factors should be weighed in determining the equities of awarding lost profits: "(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.")).  Weighing these factors in the instant case, the Court concludes that an award of Plaintiffs/Counter-Defendants' profits in the markets outside Texas identified in Plaintiffs/Counter-Defendants' motion for reconsideration would result in a windfall to Defendants/Counter-Plaintiffs and a penalty to Plaintiffs/Counter-Defendants and that such a result is precluded by the equities of this case.

"The first [factor] - whether the defendant had an intent to confuse or deceive - addresses whether there has been a willful infringement on the trademark rights of the plaintiff, or whether the defendant acted in bad faith."  *Synergistic*, 470 F.3d at 175.  The Court concluded in its earlier opinion and Order that "there is a genuine issue of material fact as to Plaintiffs/Counter-Defendants good faith in entering the Texas market after the 1998 denial of its application for federal registration." (Dkt. No. 291, Opinion and Order, 40 n. 9.)  The Court did not conclude whether there exists a genuine issue of fact with respect to Plaintiffs/Counter-Defendants good faith expansion of their mark outside the State of Texas following the denial of their application.  Significantly, an alleged infringer's knowledge of a "refusal by the United States Patent Office to register a mark is not of itself evidence of bad faith" supporting a request for lost profits.  *Nalpac, Ltd. v. Corning Glass Works*, 784 F.2d 752, 755 (6th Cir. 1986).  "An 'innocent' or a bona fide junior user ... is one, we think, whose use is not attributable to intent to obtain a free ride on the reputation of the owner

of the trade-mark...." *Id.*[1]  Because Defendants/Counter-Plaintiffs proffered no evidence that they

ever served or attempted to serve a particular market outside the State of Texas prior to the 2005-

2006 licensing activities following the filing of this lawsuit, there is no reasonable basis to conclude

that they earned a reputation or amassed goodwill in those markets.  Nor would there be a reasonable

basis to conclude, therefore, that Plaintiffs/Counter-Defendants intended to trade on

Defendants/Counter-Plaintiffs' reputation in expanding the use of their mark in those markets.  Even

assuming that an issue of fact did exist with respect to Plaintiffs/Counter-Defendants' "intent to

confuse or deceive" consumers in expanding use of the Homestead mark outside the State of Texas,

such a finding would be decidedly outweighed by consideration of the remaining relevant factors,

each of which weighs heavily against an award of profits outside the State of Texas in this case.[2]

"The second factor identified above - whether sales have been diverted - involves the issue

---

[1] The Court recognizes that the holding in *Nalpac* that willfulness is a prerequisite finding to an award of lost profits has been discredited in subsequent holdings of the Sixth Circuit.  *See, e.g., Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 607 (6th Cir. 1991) (quoting *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 941 (7th Cir. 1989)).  *Nalpac* remains helpful and germane in its discussion of bad faith, which remains an issue to be considered in determining whether to allow an award of damages under the Lanham Act.  *See Maker's Mark Distillery, Inc. v. Diageo North America, Inc.*, 703 F. Supp. 2d 671, 703 n. 41 (E.D. Ky. 2010) (finding the *Nalpac* analysis "helpful beyond the issue of willful infringement, because bad faith is still one of many relevant factors to consider when awarding damages.").

[2] In *Laukus v. Rio Brands, Inc.*, 391 F. App'x 416, 423-424 (6th Cir. 2010), the Sixth Circuit remanded to the district court for reconsideration of its decision to deny an award of profits, specifically upholding the court's consideration of the *Quick Technologies* factors but finding that the court had improperly concluded that there was no genuine issue of fact on the issue of intent to deceive where there was evidence that the defendant had sought and been denied registration by the USPTO due to the similarity to plaintiff's federally registered mark.  Unlike the instant case, however, consideration of the  other *Quick Technologies* factors in *Laukus* did not decidedly weigh against an award of profits.  In this case, even viewing the facts in the light most favorable to the Defendants/Counter-Plaintiffs and assuming an intent to deceive, this is but one factor to consider and the totality of the circumstances, considering all of the relevant factors, precludes an award of Plaintiffs/Counter-Defendants' profits.

of whether the plaintiff lost sales as a result of the defendant's trademark infringement activities, and

the extent to which the plaintiff had entered the market area where the infringement occurred."

*Synergistic*, 470 F.3d at 175. "The fact that a plaintiff had not entered the relevant market-place

when the infringement was ongoing, in combination with the fact that no sales were diverted, should

weigh against an award being made." *Id.* at 175-176. There is no competent evidence that

Defendants/Counter-Plaintiffs have ever entered, or even attempted to enter (with the exception of

Michigan where they did not possess superior rights) the markets identified in their motion for

reconsideration, directly or through licensing, into which they claim that Plaintiffs/Counter-

Defendants expanded the use of their mark outside the State of Texas after Defendants/Counter-

Plaintiffs' federal registration of the mark. (Defs.'/Counter-Pls.' Mot. Recon. 7-8.)[3] Nor is there

_____

[3] Indeed, in his deposition Fitzner testifed that he did not attempt to expand the use of his mark through licensing, testifying that he was aware of one "event" in 2001 regarding a possible inquiry but Fitzner told his attorney "to just take care of it and get it out of the way." (Dkt. No. 187, Ex. B, Fitzner Dep. 40-41.) No license was ever granted at that time. Not until after being contacted by Mr. Chase with regard to the filing of this lawsuit, and being apprised that a large company was using a similar mark, did Mr. Fitzner ever attempt to license his mark to anyone, subsequently granting licenses to Mr. Chase in 2005, to David Faul in three counties in Texas in 2006 and to Homestead Mortgage Company in the states of Washington and Oregon in 2006. Both Faul and Homestead Mortgage Washington had been operating for several years in their respective markets under different iterations of the Homestead name prior to being approached by Mr. Fitzner and agreeing to begin paying a licensing fee. Also, sometime early in 2007, Fitzner allowed his mortgage broker's license in Texas (the only state in which he had ever been licensed) to lapse and has only recently reacquired his Texas license. Mr. Fitzner's ability to close loans in Texas, or anywhere else in the United States, was compromised by his suspended license as well as by personal problems that Mr. Fitzner testified plagued him during this time frame. (Dkt. No. 187, Ex. G, 9/11/07 Letter from Fitzner to Texas Dep't of Savings & Mtg. Lending; Dkt. No. 292, Ex. D, Fitzner Aff. ¶ 6.) Nor did Defendants/Counter-Plaintiffs show any particular regard for the fact that others were using related marks throughout the United States, as evidenced by the fact that they have now unearthed no fewer than 29 alleged infringers, located in many of the states where they now seek to reap the benefit of profits earned solely through the efforts of others, including Plaintiffs/Counter-Defendants, in those markets. (Dkt. No. 275, Ex. C.) Plaintiffs/Counter-Defendants have ceased use of the Homestead mark altogether and have not used the mark for some years. (Dkt. No. 292, Ex. B, p. 13.) In fact, on May 16, 2007, Plaintiffs/Counter-Defendants stipulated to the dismissal of their claims and to

evidence of sufficient weight and quality to withstand summary judgment which establishes that

Defendants/Counter-Plaintiffs lost sales or opportunities to license the mark outside the State of

Texas as a result of Plaintiffs/Counter-Defendants' allegedly infringing activities.[4]  This factor

weighs against an award of profits which, under these circumstances, would be purely punitive in

nature and would in fact constitute a windfall to Defendants/Counter-Plaintiffs, results expressly

prohibited by the mandate of the Lanham Act.[5]

"The third of the six factors - the adequacy of other remedies - addresses whether another

remedy, such as an injunction, might more appropriately correct any injury the plaintiff suffered

from the defendant's infringement activities." *Synergistic*, 470 F.3d at 176.  First, the Court has

already ruled that Defendants/Counter-Plaintiffs may proceed to trial with their claim for lost profits

---

dissolution of the permanent injunction granted by this Court in their favor, which would have left
Defendants/Counter-Plaintiffs free to embark on their expanded use campaign.  (Dkt. No. 147.)
Defendants/Counter-Plaintiffs chose to continue this litigation instead.

[4] In their motion for reconsideration, Defendants/Counter-Plaintiffs state: "In fact, the licensing
campaign that Defendants/Counter-Plaintiffs had started in Michigan, Washington and Texas could
well have continued into all of the listed territories.  The licensing could have turned into a lucrative
franchising opportunity but for the activity of Plaintiffs/Counter-Defendants."  (Mot. Recon. 8, Exs.
C, D.)  Unfortunately, as discussed above, proffering Bob Fitzner's opinion that this is the case does
not sustain Defendants/Counter-Plaintiffs' burden on this issue.  Defendants/Counter-Plaintiffs have
offered no competent evidence to support such speculative remarks.  An accounting of profits cannot
be awarded on "evidence of unjust enrichment and diversion of sales [that is] speculative at best.'"
*Quick Technologies*, 313 F.3d at 349 (quoting *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 369
(5th Cir. 2000)).

[5] With respect to Plaintiffs/Counter-Defendants' activities in Texas, this factor tips the balance of
equities in favor of Defendants/Counter-Plaintiffs, who had a significant and established presence
in the Texas market.  While Defendants/Counter-Plaintiffs have not produced evidence of actual lost
sales or customers in the State of Texas, the fact that they had a substantial presence in that market
was a factor in the Court's earlier ruling allowing them to attempt to establish their entitlement to
a share of Plaintiffs/Counter-Defendants' profits in that market.

in the Texas market. Second, although the Court has not awarded Defendants/Counter-Plaintiffs injunctive relief, Plaintiffs/Counter-Defendants have ceased all use of the mark, rendering an award of injunctive relief moot for purposes of this litigation. This factor also, therefore, weighs against an award of profits because the equities have been satisfied by the relief already awarded by the Court.

"The fourth factor - unreasonable delay by the plaintiff in asserting its rights - addresses the temporal issue of whether the plaintiff waited too long, after the infringement activities began, before seeking court relief. A substantial delay between the commencement of infringement activities and the plaintiff seeking judicial relief should weigh against an award of damages." *Synergistic*, 470 F.3d at 176. In its initial Opinion and Order, the Court discussed the fact that Defendants/Counter-Plaintiffs delayed an unreasonable amount of time in asserting their rights to protect their mark. (Dkt. No. 291, Opinion and Order 32.) This factor, therefore, also weighs against an award of profits.

"The fifth factor - the public interest in making the infringement misconduct unprofitable - addresses the balance between a plaintiff's right to be compensated for the defendant's trademark infringement activities, and the statutory right of the defendant to not be assessed a penalty." *Synergistic*, 470 F.3d at 176. In this case, allowing Defendants/Counter-Plaintiffs to share in the profits earned by Plaintiffs/Counter-Defendants in markets where Defendants/Counter-Plaintiffs never even attempted to establish their mark or goodwill would be punitive in nature. There is no evidence that Defendants/Counter-Plaintiffs had established a reputation or any goodwill in the markets identified in Defendants/Counter-Plaintiffs' Motion for Reconsideration - markets which Defendants/Counter-Plaintiffs never entered nor attempted to enter. There is  no competent

11

evidence, therefore, of unjust enrichment, i.e. there is no evidence that Plaintiffs/Counter-Defendants used the goodwill or reputation of Defendants/Counter-Plaintiffs in earning profits in markets outside the State of Texas. Absent any evidence of the possibility of such unjust enrichment or diversion of sales, an accounting of profits in those markets would constitute a windfall to Defendants/Counter-Plaintiffs and would only serve to penalize Plaintiffs/Counter-Defendants. This factor weighs against an award of profits.

"The sixth and final factor - whether the situation involved a case of 'palming off' - involves the issue of whether the defendant used its infringement of the plaintiff's mark to sell its products, misrepresenting to the public that the defendant's products were really those of the plaintiff." This case does not involve a claim of palming off, nor could it in markets where admittedly the Defendants/Counter-Plaintiffs and Plaintiffs/Counter-Defendants never operated simultaneously. *Texas Pig Stands v. Hard Rock Café, Int'l, Inc.*, 951 F.2d 684, 695 (5th Cir. 1992) (finding no potential for palming off where TPS and Hard Rock never competed or operated restaurants simultaneously in the same town). There is no evidence that Plaintiffs/Counter-Defendants achieved their success in these non-Texas markets due to some association with Defendants/Counter-Plaintiffs' federally registered mark. There is no evidence that Plaintiffs/Counter-Defendants tried to confuse consumers in these non-Texas markets or to deceive them into believing that the product they were selling was actually Defendants/Counter-Plaintiffs' product.[6] This factor weighs against an award of profits in the markets identified in

---

[6]   The mere fact that Plaintiffs/Counter-Defendants may have had knowledge of Defendants/Counter-Plaintiffs' mark does not compel the conclusion that they attempted to therefore profit from that mark. As the Fifth Circuit noted in *Texas Pig Stands*, quoting with approval the findings of the trial court: "'[W]hile the Court believes that defendant sold pig sandwiches knowing of plaintiff's mark, it appears that this was done not as an attempt to profit from the mark but rather

12

Plaintiffs/Counter-Defendants' motion for reconsideration.

All but one of these equitable factors weigh heavily against an award of an accounting of Plaintiffs/Counter-Defendants' profits outside the State of Texas in this case. There is no genuine issue of material fact that: (1) Fitzner never attempted to use the mark outside the State of Texas (indeed Fitzner was never licensed anywhere but Texas), (2) Fitzner never attempted to license the mark to anyone outside the State of Texas until sometime in 2005, after the inception of this lawsuit, (3) Fitzner lost his license in the State of Texas in 2007 and only recently regained his ability to conduct mortgage business in the State of Texas and was beset by personal problems during the time preceding the suspension of his license in 2007, (4) Plaintiffs/Counter-Defendants ceased all use of the mark during the pendency of this litigation, specifically as of March 31, 2006, and stipulated on May 16, 2007 to dismissal of their claims and dissolution of the permanent injunction granted by this Court in their favor, which left Defendants/Counter-Plaintiffs free as of that time to use their mark anywhere they chose without interference from Plaintiffs/Counter-Defendants, and (5) Defendants/Counter-Plaintiffs have presented no evidence, of a weight and quality necessary to sustain their burden at the summary judgment stage, of actual damage outside the State of Texas to their goodwill, their sales or their ability to license their mark.

Despite these facts, Defendants/Counter-Plaintiffs ask this Court to exercise its equitable powers to permit them to seek an award of a share of profits that Plaintiffs/Counter-Defendants' have earned through the years in markets that Defendants/Counter-Plaintiffs never penetrated and never attempted to penetrate. In view of the overall facts and equities of the case, an award of profits is not appropriate. Equity does not demand, indeed equity precludes, such a result. The Court

in simple disregard of plaintiff's rights.'" 951 F.2d at 695.

finds no palpable defect in its conclusion that Defendants/Counter-Plaintiffs' efforts to recover a

share of Plaintiffs/Counter-Defendants' profits must be limited to business done only in the State

of Texas and DENIES Defendants/Counter-Defendants' motion to reconsider this ruling. The Court

further AMENDS its December 27, 2010 Opinion and Order by adopting its expanded discussion

of this issue in the instant Opinion and Order.

> **C.      Alleged Palpable Defects Nos. 3 and 4: Dismissal of Defendants/Counter-Plaintiffs' Claims for Damages for Corrective Advertising and Suppressed Royalties**

These arguments "merely present the same issues ruled upon by the Court" in its original

Opinion and Order. E.D. Mich. L.R. 7.1(h)(3). "[A] motion for reconsideration is not properly used

as a vehicle to re-hash old arguments or to advance positions that could have been argued earlier but

were not." *Smith*, 298 F. Supp. 2d at 637. As the Court discussed in its December 27, 2010 Opinion

and Order, Defendants/Counter-Plaintiffs' evidence of actual damage is supported solely by the

opinion testimony of Bob Fitzner, in which Mr. Fitzner could not identify one lost sale, one lost

licensing opportunity or one confused customer with any degree of specificity. (Dkt. No. 292, Ex.

C, Fitzner Dep. 75-76, Ex. D Fitzner Aff. ¶¶ 15-17.) He never identified the market where any

confusion allegedly took place or where a licensing opportunity was lost. Nor could he say with

certainty whether the anonymous and allegedly confused callers were referring to conduct of these

Plaintiffs/Counter-Defendants or to some other user of the Homestead mark, of which there were

at least 29, according to Defendants/Counter-Plaintiffs' own evidence.

As discussed more fully in the Court's December 27, 2010 Opinion and Order, the evidence

proffered to establish actual damage is not of the weight and quality sufficient to meet

Defendants/Counter-Plaintiffs' burden at the summary judgment stage. The Court finds no palpable

defect in its conclusion that Defendants/Counter-Plaintiffs are not entitled to seek monetary damages for corrective advertising or suppressed royalties and DENIES Defendants/Counter-Plaintiffs' motion to reconsider this ruling.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Defendants/Counter-Plaintiffs' motion for reconsideration (Dkt. No. 292.)

The Court further AMENDS its December 27, 2010 Opinion and Order by adopting its expanded discussion, at pages 4-14 of this Opinion and Order, denying Defendants/Counter-Plaintiffs' claim to an entitlement to an accounting of Plaintiffs/Counter-Defendants' profits outside the **State of Texas.**

IT IS SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE


Dated:  February 22, 2011

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on February 22, 2011.


s/Denise Goodine
Case Manager